[L.A. No. 31523. Aug. 15, 1983.]

INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, LOCAL 145, Plaintiff and Appellant, v.
CITY OF SAN DIEGO et al., Defendants and Appellants.

**COUNSEL**

Bruce Cornblum, Popko, Cornblum & McLean and Popko & Cornblum for Plaintiff and Appellant.

John W. Witt, City Attorney, Ronald L. Johnson, Chief Deputy City Attorney, David H. Morris and Alejandro Matuk, Deputy City Attorneys, for Defendants and Appellants.

## Opinion

**RICHARDSON, J.**—Defendants City of San Diego (City) and San Diego City Employees Retirement Board (the Board) appeal from a judgment invalidating an increase in the rate of contribution to City's retirement system required of its firefighter employees effective July 1, 1978. Plaintiff International Association of Firefighters, Local 145, which represents those employees, cross-appeals from a denial of its application for attorney's fees made pursuant to statute. (See Code Civ. Proc., § 1021.5.)

The primary issues are: (1) whether defendants are authorized by City's actuarially based retirement system to increase the employees' contributions to the system without providing commensurate added benefits to those employees and, if so, (2) whether in this instance defendants nonetheless should be estopped from effecting such increase because of certain representations contained in retirement handbooks distributed to those employees at the time of employment.

The trial court answered both questions in the affirmative and barred defendants from adjusting either upward or downward the rate of contribution required of any firefighter employed by City on or before February 14, 1980, except to reflect changes in the retirement plan's benefits or increased earnings of the retirement fund. (The significance of the February 14, 1980, cutoff date is unclear, but may represent the time when the retirement handbooks in question ceased to be distributed to City's employees.)

We conclude that defendants' retirement system does not preclude the modification in the rate of employees' contributions instituted by defendants. We also conclude that the retirement handbooks did not make misrepresentations to employees which would warrant application of estoppel principles to this case. Accordingly, we reverse the trial court's judgment on those issues, while affirming its denial of attorney's fees to plaintiff.

### Procedural History and Issues

City has operated a retirement pension plan on behalf of its employees since 1923. Prior to 1955, the plan provided for a flat rate of contribution

from employees. In 1955 City amended its charter to provide for a new retirement system in which contributions of employees and City to the retirement fund are computed upon the basis of actuarial advice designed to estimate the funding needed to accrue a guaranteed retirement allowance upon retirement. The retirement allowance in question is equal to 1/50 of the employee's highest average compensation, multiplied by the number of years he or she is employed, with an additional increment for retirement after age 50.

In December 1977 the Board, which administers the retirement system, acting upon the advice of an actuary, raised the average rate of contribution to the retirement system fund required of "safety members" (including firefighters) from 8.22 percent to 11.68 percent of the employee's gross salary, effective July 1, 1978. The basis for this increase was a recommendation by the American Academy of Actuaries that an additional factor be included among the assumptions to be considered by all members of that academy in providing calculations for pension systems. That factor was the impact of inflation on employees' future salaries. Although such impact historically had been disregarded because it was viewed as a short-term phenomenon, it was generally acknowledged by this profession in 1976 that inflation was here to stay for the foreseeable future. In implementing the academy's recommendation, it was assumed that an employee would enjoy salary increases equal to 3½ percent per year throughout his or her career. Explicit recognition of that factor by City's actuary resulted in his recommendation that the employees' rate of contribution be increased to the extent indicated. The Board adopted that recommendation.

In response to the 1978 rate increase, plaintiff filed this lawsuit on behalf of its members, seeking to invalidate the increase. Rejecting plaintiff's contrary claims, the trial court found that the retirement system neither guaranteed employees a fixed percentage rate of contribution to the retirement fund nor required that any rate increases be matched by increased benefits. It also found that the Board was justified in considering current economic conditions in respect to inflation in recalculating employees' contributions and that its rate increase was arrived at in good faith and was within reasonable limits. The trial court nonetheless concluded that the Board was estopped from increasing the employees' contribution rate because of certain statements in a retirement system handbook which had been distributed to employees. According to the trial court's reading, the handbook represented that safety members' contribution rate would never be increased unless additional benefits were provided to them. It is undisputed that no such benefits accompanied the rate increase at issue.

City agrees with the trial court's interpretation of its retirement system as authorizing the increase, but objects to the application of estoppel to bar implementation of the otherwise permissible increase. Plaintiff's position is the reverse. Accordingly, we discuss both challenges to the rate increase.

## THE RETIREMENT SYSTEM

City's authorization to establish by ordinance a retirement system for its employees appears in article IX, section 141 of its charter. The charter mandates that contributions to the system shall be made jointly by employees and City (San Diego City Charter, art. IX, § 143), and provides for the employment of an actuary to assist in establishing the system (*id.*, § 144). Employees are required to contribute "according to the actuarial tables adopted by the Board of Administration [the Board] for normal retirement allowances . . . . The City shall contribute annually an amount substantially equal to that required of the employees . . . as certified by the actuary, but shall not be required to contribute in excess of that amount, except in the case of financial liabilities accruing under any new retirement plan or revised retirement plan because of past service of the employees. The mortality, service, experience or other table calculated by the actuary and the valuation determined by him and approved by the board shall be conclusive and final, and any retirement system established under this article shall be based thereon." (*Id.*, § 143.) All contributions are to be placed into the City Employees' Retirement Fund (*id.*, § 145), and the retirement system is to be managed by the Board (*id.*, § 144).

The charter also expressly authorizes City to enact any additional ordinances necessary to implement the retirement system and provides that such ordinances shall have equal force and effect with the charter provisions in the construction of the system. (*Id.*, § 146.)

The charter thus establishes that the amount of contributions by employees and City to the retirement system to be enacted by ordinance are to be substantially equal and are to be tied directly to the "normal retirement allowances" to which employees shall be entitled, with the entire system to be based upon actuarial advice.

By city ordinance adopted pursuant to the charter, the Board is authorized to provide a "normal retirement allowance" for "members" and "safety members." (San Diego Mun. Code, art. 4, § 24.0401; unless otherwise indicated, all further section references are to that code and article.) A "safety member" in this context is defined as a "uniformed member of the Fire Department of the City of San Diego employed since July 1, 1946

. . . ." (§ 24.0103, subd. f.) The trial court and the parties construe this definition reasonably to cover any such firefighter first employed by City *after* July 1, 1946.

Another ordinance of City provides that the normal retirement allowance for a safety member shall consist of two portions: a service retirement annuity and a pension. (§ 24.0403.) The service retirement annuity is to be the actuarial equivalent of the safety member's accumulated normal contributions at the time of her or his retirement; the other portion is a pension derived from the contributions of the City, sufficient, when added to the service retirement annuity, to equal 1/50 of the "final compensation" of a safety member who retires at age 50 for each year of his employment, with an additional increment for retirement after age 50. (*Ibid.*) "Final compensation," in turn, is defined as the member's highest average annual compensation measured over any three-year period. (§ 24.0103, subd. *l.*) In more concrete terms, a safety member who retires at age 50 after 25 years of service will receive a normal retirement allowance equal to one-half of his highest average salary.

As noted, the normal retirement allowances provided by the retirement system determine the amount of both employees' and City's contributions thereto; and the amount of City's required contributions is defined partly in terms of safety members' contributions. Accordingly, we first examine the system's provisions relating to such members' contributions.

Section 24.0301 provides that "The normal rates of contribution for safety members shall be based on age as of July 1, 1954, or thereafter at the nearest birthday at the time of entrance into the system." (§ 24.0301, subd. 1.) With respect to the actual calculation of those rates, the system provides, insofar as relevant here, "normal rates of contribution for each safety member shall be such as will provide an average annuity at age 50 equal to 1/100th of his final compensation, according to the tables adopted by the Board of Administration for each year of service rendered after entering the system." (§ 24.0301, subd. 2.) The mortality, service and other tables and interest rates to be adopted by the Board are to be based upon the investigations, valuations and determinations of an actuary employed by the Board. (§ 24.0903.)

Actuarial evaluations of the assets and liabilities of the retirement system are required annually; more comprehensive actuarial investigations of such factors, together with the mortality, service and compensation experience of members and persons receiving benefits, must be made at least every five years; and the rate of interest being earned by the retirement fund must be

determined "from time to time." (§ 24.0901.) Defendants assert, without contradiction, that the data to be considered in these investigations are mortality rates, retirement fund earnings, and the anticipated compensation of employees throughout their careers.

 The system contemplates that the Board shall "periodically" adopt the normal rate of contribution of safety members "based upon the advice of the Actuary" (§ 24.0302, subd. 1) and, in the following language—most significantly for our purposes—expressly provides for modification of contribution rates based upon the foregoing periodical investigations: "On the basis of any and all of such investigations, valuations and determination *the Board shall* adopt such mortality, service and other tables and interest rates as it deems necessary and *make such revisions* in rates of contribution of members as it deems necessary to provide the benefits for which the rates for normal contributions are required to be calculated. The decision of the Board of Administration on matters covered by this section, if arrived at in good faith, shall be conclusive." (§ 24.0903, italics added.)

Plaintiff does not contend that the unadorned noun, "members," contained in the foregoing quotation is inapplicable to "safety members." The general nature of this provision would indicate its application was intended to be comprehensive, covering safety as well as nonsafety members. Further, an additional provision dealing directly with City's contributions underscores the applicability to "safety members" of the foregoing discussion of revision of "members" rates. Section 24.0801 provides: "Commencing July 1, 1954 the City shall contribute to the Retirement Fund in respect to *members* a percentage of earnable compensation as determined by the System's Actuary pursuant to the annual actuarial evaluation required by Section 24.0901. The required City contributions shall be determined separately by the Actuary for *General Members and Safety Members.*" (Italics added.) (Section 24.0901, it will be recalled, authorizes the actuarial investigations, evaluations and interest rate determination upon which revisions in the rate of members' contributions are to be based.)

In summary, it would appear that a safety member's normal retirement allowance is a sum equal to 1/50 of his final compensation, multiplied by his years of service. Such allowance is to be funded by actuarially determined contributions of the member and City. The member's contributions are designed to be sufficient to accrue one-half of the allowance, based on actuarial tables for mortality, fund earnings and employee compensation. The other half is funded by City's contributions, which are to be substantially equal to those of members and must, in any event, be sufficient when combined with member contributions to equal the final retirement allow-

ance. Periodically, contribution rates may be revised in accordance with actuarial reevaluation of the relevant factors.

Rather than being foreign to City's retirement system, modification of the contribution rates of both employees and City is intrinsic to the ordinances basing those rates on actuarial factors which can be revised. Upward adjustment of contributions thus became inevitable when the Board adopted a revised actuarial table to reflect the impact of increasing inflation on an employee's future compensation and, therefore, on his normal retirement allowance. Plaintiff does not dispute the soundness of the new inflation factor based on the assumption that a safety member would enjoy an average annual increase in compensation of 3½ percent over the course of his employment. Further, while it is not clear whether City's contributions were or will be adjusted to reflect the revised actuarial table, such adjustment would not appear to be necessary here to comply with the retirement system. The effect of incorporation of the inflation factor was to shift the relative contribution rates of members and City. Prior to the 1978 rate increase, City's contributions to the system were more than twice as large as safety members'; after that increase, City still contributes approximately one and one-half times as much as such members. It is apparent that this shift thus merely makes City's contribution more "substantially equal" to that of the members, as City's retirement system requires. That system provides both the authority and the mechanism to revise members' rates, and the Board's increase appears to have been accomplished in conformity therewith, as the trial court found.

Plaintiff nonetheless contends that the increase in the rate of employee contributions ordered by the Board without any corresponding benefit to employees somehow illegally destroyed vested pension rights of its members. (Any employee rights actually vested are expressly protected under City's plan. (§ 24.0102.)) ■ In support of its contention, plaintiff cites the well settled principle that: "A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment. Such a pension right may not be destroyed, once vested, without impairing a contractual obligation of the employing public entity." (*Betts* v. *Board of Administration* (1978) 21 Cal.3d 859, 863 [148 Cal.Rptr. 158, 582 P.2d 614]; see *Kern* v. *City of Long Beach* (1947) 29 Cal.2d 848, 853 [179 P.2d 799].)

■ Of course, we have repeatedly observed that even such "vested contractual pension rights may be modified prior to retirement for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the sys-

tem. (*Wallace* v. *City of Fresno* [1954] 42 Cal.2d 180, 184 . . .; *Packer* v. *Board of Retirement* [1950] 35 Cal.2d 212, 214 . . .; *Kern* v. *City of Long Beach* [1947] 29 Cal.2d 848, 854-855 . . . ." (*Allen* v. *City of Long Beach* (1955) 45 Cal.2d 128, 131 [287 P.2d 765].) Nonetheless, "[s]uch modifications must be reasonable," and to be sustained as such, "alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages. [Citations.]" (*Ibid.*) Further, "it is advantage or disadvantage to the particular employes whose own contractual pension rights, already earned, are involved which are the criteria by which modifications to pension plans must be measured . . . ." (*Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 449 [326 P.2d 484].)

██ While it is clear, therefore, that employees' "vested" contractual rights may not be destroyed or impaired, plaintiff fails to identify exactly what employee rights *are* vested under City's retirement system, and thereby misses the crucial distinction between the cases cited and the matter before us.

In *Kern, supra,* for example, we found that an attempt by the City of Long Beach to *repeal* its pension system without providing an alternative retirement plan violated that city's contractual obligations. (29 Cal.2d at pp. 854-855.) Total elimination of the employees' contractual right to a pension obviously destroyed vested rights, and we had no occasion to examine the scope of permissible modifications in existing plans because none was proposed there. (*Ibid.*)

In *Allen, supra,* we found impermissible the same city's attempt to substitute a fixed retirement pension, frozen at the level of a retired employee's highest salary, for an existing pension, which had been allowed to fluctuate to reflect changes in the salary schedule of the current occupant of his position, and to make other changes disadvantageous to the retired employee without providing commensurate advantages. (45 Cal.2d at pp. 131, 133.) We found that the city's purpose in so modifying the plan of seeking to have its pension system more nearly coincide with a state pension plan provided for similar employees bore "no relation to the functioning and integrity of the pension system" so modified and constituted "no justification for materially reducing the vested contractual rights earned by" the employees before the changes were adopted. (*Id.,* at p. 133.) (While we did not describe all of the provisions of the pension plan which would identify all the actual contractual rights vested in the employees in *Kern,* we infer that the plan did not by its terms permit the city's unilateral substitution of

the fixed retirement benefit for the fluctuating one or the other disadvantageous modifications instituted there.)

Similarly, in *Abbott, supra,* we held that modifications in Los Angeles' retirement system substituting a "fixed" pension for a "fluctuating" one, and requiring for the first time that employees contribute a percentage of their salaries to the pension fund, could not be applied to city employees who were first employed prior to the date of the modifications. (50 Cal.2d at pp. 445, 451.) As in *Allen, supra,* we concluded in *Abbott* that the amendments in question bore no "material relation to the integrity or successful operation or to the preservation or protection of the pension program," at least insofar as applied to such employees (*id.,* at p. 455), and dismissed the city's speculative claim that the pension plan might have ceased to exist if the amendments had not been made. (*Ibid.*)

More recently in *Betts, supra,* we applied a similar analysis to bar modification of the state employee retirement system, substituting a "fixed" pension for a "fluctuating" one, to a former state treasurer who had retired before that modification was adopted. (21 Cal.3d at p. 862.) Observing that a public "employee does not obtain, prior to retirement, any absolute right to fixed or specific benefits, but only to a 'substantial or reasonable pension' [citation]" (*id.,* at p. 863), we nonetheless held that the disadvantageous provisions of the state pension system adopted after he left office without providing him "comparable new advantages" could not "constitutionally be applied to petitioner, because the amendment withdraws benefits to which he earned a vested contractual right while employed." (*Id.,* at p. 867.)

What distinguishes each of these cases from the one before us is the nature of the contractual rights which became vested in plaintiff's members upon their acceptance of employment. In the cases relied upon by plaintiff, employees' vested contractual rights were modified by amendment of the controlling provisions of the retirement system in question to reduce (or abolish) the net benefit available to the employees. In the present case, no modification was made in the retirement system; instead, the revision in the factor representing future compensation of employees and the resulting revision in the rate of contribution of employees were made *pursuant to* the charter and ordinances which delineate City's retirement system and prescribe the employees' vested rights.

Plaintiff's argument that the raising of its members' contribution rate impaired their rights rests upon the erroneous assumption that such members had a vested right to a fixed contribution rate. That argument is based upon

that provision of the retirement system which declares that a safety member's rate of contribution "shall be based on age . . . at the time of entrance into the system." (§ 24.0301, subd. 1.) Plaintiff would have us construe that provision to mean that such a member's rate of contribution is fixed forever at the level of his initial contribution. That construction seems unreasonable. To "base" is not to "fix permanently." In our view, the language relied upon by plaintiff does no more than identify an employee's age as one factor which determines his rate of contribution in light of the then operative actuarial factors concerning mortality, retirement fund earnings and compensation increases, as determined by the actuary and approved by the Board, and upon the basis of which the actuary and the Board are to calculate the contributions necessary to generate the employee's ultimate retirement allowance. The employee's age at the time of entry into the system obviously is relevant to a number of factors which are crucial to benefit calculations under the system, including the number of years he will be able to serve under the system before his normal retirement age, and, therefore, to both his ultimate retirement allowance and the contributions which will be necessary actuarially under the system's formula to accrue his one-half of that allowance. Further, there is no express provision in the retirement system purporting to *freeze* the rate of employee contributions. On the contrary, the system does explicitly provide for both setting and *revising* of employee contribution rates upon the basis of the actuarial information and revisions thereto.

In short, neither the normal retirement allowance to which a safety member is entitled under City's retirement system, nor the rate of contribution required of such member (and of City) to fund that allowance is fixed. Both depend, in part, on actuarial assumptions concerning employees' future compensation. When, pursuant to periodic reevaluation, those actuarial assumptions are modified, so too must the contributing rate be adjusted to generate the funds necessary to provide the normal retirement allowance prescribed by the system. Change in contribution is implicit in the operation of City's system and is expressly authorized by that system and no vested right is impaired by effecting such change. In this essential regard, City's retirement system differs from those described in the authorities relied upon by plaintiff, and its reliance thereon is misplaced.

Nor does plaintiff challenge the trial court's findings that the specific change in actuarial assumptions involved in the instant case was justified economically and that the 3½ percent increase in safety member contributions ordered by the Board was both reasonable and reached in good faith. We agree that City's actuarially based retirement system authorized the modification in the safety members' contribution rate ordered here.

ESTOPPEL

■ Plaintiff's second claim is that even if the Board is otherwise generally authorized to increase the safety members' contribution rate to the retirement system, it should be estopped from doing so in this case because of its representation to those members at the time of their employment that such rates would not be increased unless additional benefits were also provided. The representation upon which the trial court based its finding of estoppel appears in question and answer form in a retirement handbook distributed to safety members. The 1971 edition of the handbook, which was introduced at trial, contains the following relevant language: "Q. As a member grows older does his rate of contribution change with his age? [¶] A. No. The percentage rate of contribution at which a member begins contributing is computed to remain unchanged. This is not to say however, that all rates could not be adjusted at some future time to reflect either changes in benefit provisions of the system or increased earnings of the Retirement Fund." (Apparently, handbooks with similar language had been distributed to safety members since 1968. It is not clear when or whether such distribution stopped.)

The trial court found that this explanation represented to each safety member that his contribution rate would never be increased unless additional benefits were provided to him. The court found that the representation was a "material" one, but that it was impracticable, if not impossible, for plaintiff to prove the actual reliance of its individual members on the representation. Concluding, nonetheless, upon the basis of "common experience" that such representations normally would induce reliance among reasonable persons, the trial court inferred such reliance and thereupon held the Board estopped from raising safety members' contributions without increasing their benefits under the retirement system.

We need not decide whether estoppel otherwise would be applicable to this case, because we conclude that the trial court erred in finding that the handbook misrepresented the retirement plan to safety members in the manner suggested. Informing each safety member that his rate of contribution will not change "with his age" simply assures him that his increasing age will not *itself* cause his rate to increase; it does not tell him that such rate will never change for any other reason. This view is corroborated by that portion of the answer quoted above which avers: "This is not to say, however, that all rates could not be adjusted at some future time . . . ." Further, the remainder of that qualifying sentence can most reasonably be construed simply to give two examples of other factors whose change *could* result in adjustment of "all rates," namely, "changes in benefit provisions" and

"increased earnings of the Retirement Fund." The sentence does not necessarily mislead a safety member to believe that his rate of contribution could change only if accompanied by a corresponding benefit. In summary, the question and answer inform the reader that his rates will not change simply because he grows older, and the answer's supplementary information identifying other factors which could cause those rates to change would not reasonably induce him to believe that they were the *only* other relevant factors that could affect his rates. Finding no misrepresentation of defendants' retirement plan in the handbook issued to the safety members, we have no occasion to consider whether the remaining elements necessary to raise an estoppel were present here.

In view of our overall conclusion that defendants should prevail on both the interpretation of the retirement system and the estoppel claim, we have no occasion to modify the trial court's denial of attorney's fees to plaintiff. Only a "successful party" may obtain an award of such fees pursuant to the statute relied upon by plaintiff. (See Code Civ. Proc., § 1021.5.)

Accordingly, we reverse the judgment of the trial court on defendants' appeal and affirm its judgment on plaintiff's cross-appeal.

Broussard, J., Reynoso, J., and Gates, J.,* concurred.

**KAUS, J.**—I concur entirely in the court's discussion of the City's power to raise the rate of contribution without corresponding increased benefits. I also concur in the court's ultimate conclusion on the issue of estoppel.

On that issue, however, I find it difficult to agree that the representations in the handbook were not—unintentionally, to be sure—misleading. It is difficult to interpret the quoted answer[1] as not saying that the percentage rate of contribution will remain unchanged, except for future adjustments to reflect changes in benefits or increased earnings.[2]

---

*Assigned by the Chairperson of the Judicial Council.

[1]"Q. As a member grows older does his rate of contribution change with his age? [¶] A. No. The percentage rate of contribution at which a member begins contributing is computed to remain unchanged. This is not to say however, that all rates could not be adjusted at some future time to reflect either changes in benefit provisions of the system or increased earnings of the Retirement Fund."

[2]There is one additional factor, not mentioned in the court's opinion. The handbook did contain a statement reading as follows: "The following information is furnished in the hope that it may aid your understanding of your retirement system. The information given here is general in nature, and is not intended to answer every detailed question regarding the system . . . . You are urged to contact the Retirement Office if you have any questions regarding your benefits or membership status in the system." If there was a misrepresentation, I doubt whether this boilerplate disclaimer would neutralize it.

Even if the handbook's statement was misleading, however, additional considerations are relevant here. This court has frequently cautioned "that an estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public . . . .'" (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 493 [91 Cal.Rptr. 23, 476 P.2d 423].) This principle is applicable to public employees' pensions. (*Longshore* v. *County of Ventura* (1979) 25 Cal.3d 14, 28-29 [157 Cal.Rptr. 706, 598 P.2d 866].)

Here, there is no proof that anyone has actually been hurt by the handbook's statement—that any employee has accepted employment or remained on the job in reliance on the misleading answer. The terms of the pension law are prescribed by the City's charter. Without some substantial showing of actual harm, it would be ludicrous if carefully crafted pension legislation could be effectively amended by a bureaucrat's somewhat inept attempt at summarization.

**BIRD, C. J.**—I respectfully dissent.

The 40 percent increase in safety members' rates of contribution to the City of San Diego (City) retirement fund violates the contract clauses of the federal and state Constitutions. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.) Each safety member has a vested contractual right to contribute to the pension system at the rate established upon his acceptance of employment. This rate may be raised only if: (1) such an increase is necessary for the system's continued viability; and (2) safety members are afforded a commensurate increase in benefits. Since neither of these conditions has been met, the trial court was correct in holding that the plaintiff members should be refunded any monies collected pursuant to this illegal increase.

In *Betts* v. *Board of Administration* (1978) 21 Cal.3d 859, 863 [148 Cal.Rptr. 158, 582 P.2d 614], this court noted that "[a] long line of California decisions" has settled the constitutional principles applicable to public employees' pension rights. "The pension provisions of a city charter are an indispensable part of the contract of employment between a city and its employees, creating a right to pension benefits as an integral part of compensation payable under such contract, which vests upon acceptance of employment." (*Abbott* v. *City of San Diego* (1958) 165 Cal.App.2d 511, 517 [332 P.2d 324]. Accord *Kern* v. *City of Long Beach* (1947) 29 Cal.2d 848, 852 [179 P.2d 799]; *Dryden* v. *Board of Pension Commrs.* (1936) 6 Cal.2d 575, 579 [59 P.2d 104].)

Nonetheless, once vested, pension rights may still be modified. "An employee's vested contractual pension rights may be modified prior to retire-

ment for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system. [Citations.] Such modifications must be reasonable, and it is for the courts to determine upon the facts of each case what constitutes a permissible change." (*Allen* v. *City of Long Beach* (1955) 45 Cal.2d 128, 131 [287 P.2d 165].) A change is "reasonable" if the "alterations of employees' pension rights . . . bear some material relation to the theory of a pension system and its successful operation, and . . . [any] disadvantage to employees [is] accompanied by comparable new advantages." (*Ibid.*)

Further, in *Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 449 [326 P.2d 484], the court made it clear that modifications to pension plans which result in general, *overall* benefits do not necessarily meet the constitutional standard of "reasonableness." "[I]t is advantage or disadvantage *to the particular employes* [sic] *whose own contractual pension rights, already earned, are involved* which are the criteria by which modifications to pension plans must be measured . . . ." (*Ibid.*, italics added.)

Using these principles, the courts have consistently invalidated increases in employee contribution rates which have not been accompanied by commensurate benefits. For example, in *Allen, supra,* 45 Cal.2d 128, this court struck down an increase in employee contribution rates adopted by the City of Long Beach. The court found that the new rate "obviously constitute[d] a substantial increase in the cost of pension protection to the employee without any corresponding increase in the amount of the benefit payments he [would] be entitled to receive upon his retirement." (*Id.*, at p. 131.)

Similarly, in *Wisley* v. *City of San Diego* (1961) 188 Cal.App.2d 482 [10 Cal.Rptr. 765], the court held that gradual increases in the contribution rates of employees over a period of years were unconstitutional. *Wisley* affirmed the trial court's conclusion that "the maximum amount that could legally be deducted from the employees' gross pay was that percentage which was in effect at the time each of the individual plaintiffs was originally employed." (*Id.*, at p. 485.) Significantly, the court did not invalidate the city's application of the increased contribution rates to employees who had entered the system after the new rates had been adopted. Nor did the court find constitutionally infirm the variation in rates paid by the employees. It was the increase in the rates by the city for employees *already in the system* that was held unconstitutional. (See also *Abbott* v. *City of Los Angeles, supra,* 50 Cal.2d at pp. 447-455.)

These rules, if followed by this court, would mandate a finding that the increase in the rates of employee contributions to the City's retirement sys-

tem violated the contract clauses of the federal and state Constitutions. The solvency or financial viability of the pension system was not a factor in the decision to raise the rates. The City stipulated that the decision of the administering board to raise the rates bore "no relationship to any unfunded liability of the system." Further, Robert Logan, city retirement officer and retirement board secretary, testified that the plan was financially sound. Sixty-three percent of the benefits already accumulated could have been paid if the plan were to be discontinued. In fact, many of the previous modifications in the employee contribution rates since 1955 had been *decreases* resulting from increased earnings of the fund.

The increased rate of contribution was a detriment to the employees in the system. Yet, Logan testified that the rate increase was not offset by a corresponding increase in benefits. Indeed, the City never contended otherwise. Since there was no benefit, *Allen* (*supra,* 45 Cal.2d 128) and *Wisley* (*supra,* 188 Cal.App.2d 482) would teach us that the increase in the contribution rates unconstitutionally impaired the vested pension rights of these employees.

Nevertheless, the majority argue that the modifications here were made *pursuant to* existing provisions of the retirement system which allowed for rate revisions based upon actuarial investigations and evaluations of the system's assets and liabilities.[1] (Maj. opn. at pp. 302-303.)

However, whether the contribution rates were increased by an amendment to the controlling provisions of the system or by a decision of the administering board under those provisions is irrelevant. An employee's right to a city's pension benefits vests upon his or her acceptance of employment. The state and federal Constitutions apply to subsequent modifications of those vested rights regardless of how such modifications are accomplished.

Moreover, the majority's distinction would permit a city to circumvent the principles established by *Kern* (*supra,* 29 Cal.2d 848) and its progeny by simply enacting flexible ordinances allowing modifications in the rates of contribution and the calculation of retirement benefits. For example, a city that enacts a pension system permitting its administrative board to re-

---

[1]Article 4, section 24.0903 of the San Diego Municipal Code provides: "On the basis of any and all of such investigations, evaluations and determination [as described in section 24.0901], the Board shall adopt such mortality, service, and other tables as it deems necessary and make such revisions in rates of contribution of members as it deems necessary to provide the benefits for which the rates for normal contributions are required to be calculated. The decision of the Board of Administration on matters covered by this section, if arrived at in good faith, shall be conclusive."

vise the formula for calculating retirement benefits would be free to substitute a fixed pension for a flexible one. Even if such a modification were disadvantageous to the city's employees, it would be constitutionally permissible. Under the majority's approach, the modification would have been made *"pursuant to* the charter and ordinances which delineate [the] retirement system and prescribe the employees' vested rights." (Maj. opn. at p. 303.)

Yet, this reasoning and result violate the principles of *Allen* and *Abbott.* In each of those cases, this court struck down as unconstitutional modifications in pension systems which changed a city's retirement benefits from fluctuating to fixed amounts. (*Allen* v. *City of Long Beach, supra,* 45 Cal.2d at pp. 131-133; *Abbott* v. *City of Los Angeles, supra,* 50 Cal.2d at pp. 447-455. See also *Abbott* v. *City of San Diego, supra,* 165 Cal.App.2d at pp. 518-520.) The revisions were invalidated because "no offsetting advantages were included"[2] and the cities had made "no showing that the . . . amendments [bore] any material relation to the integrity or successful operation or to the preservation or protection of the pension program applicable to these plaintiffs."[3] The constitutional protections which public employees have been guaranteed would have little value if this court were to allow them to be so easily circumvented. Indeed, there would, in effect, be no limits to the modifications to pension benefits which cities could enact.

Under section 24.0903, the City may revise the rates of *new members entering the system* when necessary to provide the members with the benefits guaranteed by section 24.0301. However, this section does *not* empower the City to increase the contribution rates of those employees already in the system unless such an increase "bear[s] some material relation to the theory of [the] pension system and its successful operation" and is "accompanied by comparable new advantages." (*Allen* v. *City of Long Beach, supra,* 45 Cal.2d at p. 131.)

The City's contention that the new safety members should not bear the burden of paying higher contribution rates than those members already in the system when both groups will receive equal benefits upon retirement was expressly rejected by this court in *Allen.* There, the defendant city contended that the increased employee contribution rates were necessary to ameliorate "personal problems" which would be created by differences in pension costs and benefits among employees who performed the same job. The *Allen* court's words were clear and precise. "Such purposes, however

---

[2]*Abbott* v. *City of San Diego, supra,* 165 Cal.App.2d at page 518.
[3]*Abbott* v. *City of Los Angeles, supra,* 50 Cal.2d at page 455.

beneficial to the city, bear no relation to the functioning and integrity of the pension system established for persons employed prior to [the enactment of the amendments], and constitute *no* justification for materially reducing the vested contractual rights earned by plaintiffs prior to the time [the amendment] was adopted." (*Id.,* at p. 133, italics added.)

Since the City's increase in the contribution rates of its safety members fails to meet the "reasonableness" test required by the state and federal Constitutions for modifying vested pension rights, the trial court's judgment should be affirmed.

Mosk, J., concurred.