[No. B027960. Second Dist., Div. One. Apr. 26, 1989.]

UNITED FIREFIGHTERS OF LOS ANGELES CITY et al.,
Plaintiffs and Respondents, v.
CITY OF LOS ANGELES et al., Defendants and Appellants.

**COUNSEL**

James K. Hahn, City Attorney, Frederick N. Merkin, Assistant City Attorney, O'Melveny & Myers, John F. Daum, Holly E. Kendig, John A. Case, Jr., and Karen R. Growdon for Defendants and Appellants.

Ball, Hunt, Hart, Brown & Baerwitz, John R. McDonough, J. Steven Greenfeld, Fogel, Feldman, Ostrov, Ringler & Klevens and Lester G. Ostrov for Plaintiffs and Respondents.

## Opinion

### SPENCER, P. J.—

#### Introduction

Defendants City of Los Angeles and Board of Pension Commissioners appeal from a judgment entered in favor of plaintiffs United Firefighters of Los Angeles City, Los Angeles Police Protective League and individual members thereof.

#### Statement of Facts[1]

Prior to 1966, the police and firefighter pension systems made no provision for the adjustment of benefits to reflect inflation. In that year, voters adopted a charter amendment which provided for such adjustments, based on the Consumer Price Index, but imposed a yearly cap of 2 percent on the adjustments. In 1971, voters approved another charter amendment which removed the cap on cost of living adjustments, permitting them instead to fully reflect the rate of inflation each year.

In June 1982, defendants placed charter amendment H on the ballot. It was passed by the voters and thenceforward became part of the city charter. The amendment placed a 3 percent cap on police and firefighter pension benefit cost of living adjustments based on the Consumer Price Index. As to presently employed members of the pension system, the amendment applied only prospectively to future years of service credited toward retirement. Each of the plaintiffs in the instant action accepted employment as a police officer or firefighter before or after the passage of the 1971 charter amendment, but in every instance before December 1980.[2]

#### Contentions

##### I

Defendants contend the trial court erred in viewing the change effected by charter amendment H as an impairment of the vested contractual pension rights of plaintiffs.

##### II

Defendants further contend the trial court applied the wrong legal standard in determining whether charter amendment H impermissibly violated the contract clause.

---

[1] As they are necessary to the discussion of the issues raised, more detailed facts will appear in the body of the opinion.

[2] Employees hired after December 1980 are members of a separate pension system embodied in article XXXV of the city charter. They are not affected by the instant litigation.

DISCUSSION

I

■ Defendants contend the trial court erred in viewing the change effected by charter amendment H as an impairment of the vested contractual pension rights of plaintiffs. We disagree.

As defendants acknowledge, this issue was decided adversely to their position in *Pasadena Police Officers Assn. v. City of Pasadena* (1983) 147 Cal.App.3d 695 [195 Cal.Rptr. 339]. They suggest, however, that this court disregard *Pasadena Police Officers Assn.*, in that the decision directly conflicts with preexisting law, is anomalous and is contrary to the law as expressed in California Supreme Court opinions. This is, as Presiding Justice Scoville said in another context, "a paradigm of disingenuousness." (*People v. Sellers* (1988) 203 Cal.App.3d 1042, 1051 [250 Cal.Rptr. 345].)

■ A public employee's entitlement to a pension "is among those rights clearly 'favored' by the law." (*Hittle v. Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 390 [216 Cal.Rptr. 733, 703 P.2d 73].) Accordingly, pension laws are to be liberally construed to protect pensioners and their dependents from economic insecurity. (*Ibid.*) Unlike other terms of public employment, which are wholly a matter of statute, pension rights are obligations protected by the contract clause of the federal and state Constitutions (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9). (*Miller v. State of California* (1977) 18 Cal.3d 808, 814 [135 Cal.Rptr. 386, 557 P.2d 970]; see also *Hittle v. Santa Barbara County Employees Retirement Assn., supra,* 39 Cal.3d at p. 390.)

*Miller* nicely recapitulates the modern law of public employment pension rights. ■ As the Supreme Court notes, "upon acceptance of public employment [one] acquire[s] a vested right to a pension *based on the system then in effect.*" (18 Cal.3d at p. 817, italics added; accord, *Carman v. Alvord* (1982) 31 Cal.3d 318, 325 [182 Cal.Rptr. 506, 644 P.2d 192].)[3]
■ "The scope of permissible modifications of vested pension rights was established in *Allen v. City of Long Beach* (1955) 45 Cal.2d 128 . . . , and *Abbott v. City of Los Angeles* (1958) 50 Cal.2d 438 . . . : 'Such modifications must be reasonable, and it is for the courts to determine upon the facts of each case what constitutes a permissible change. To be sustained as

---

[3] A public employee likewise acquires a vested right to additional pension benefits thereafter conferred during his or her subsequent employment. (*Betts v. Board of Administration* (1978) 21 Cal.3d 859, 866 [148 Cal.Rptr. 158, 582 P.2d 614]; accord, *Olson v. Cory* (1980) 27 Cal.3d 532, 540 [178 Cal.Rptr. 568, 636 P.2d 532].)

reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages.' [Citation.] '[I]t is advantage or disadvantage to the particular employees whose own contractual pension rights, already earned, are involved which are the criteria by which modifications to pension plans must be measured.' [Citation.]" (*Miller, supra,* 18 Cal.3d at p. 816.)

*Miller* reaches the conclusion the plaintiff had, *under the system in effect when he accepted public employment,* acquired a vested right to achieve maximum benefits by working to age 70. (18 Cal.3d at p. 817.) Before he reached that age, the state changed the mandatory retirement age from 70 to 67. ■■ It was free to do so, since the duration of public employment is a matter of statute rather than contract. (*Id.,* at pp. 813-814.)

The Supreme Court then holds: "Although [plaintiff's] right to a pension based on this system *was vested,* plaintiff was not assured of receiving maximum pension benefits. His right to receive such benefits was subject to conditions and contingencies; specifically, that he remain in state employment until age 70. Plaintiff failed to satisfy that condition since he was lawfully placed on retirement at age 67. Thus, his right to a maximum pension based on retirement at age 70 never matured. [¶] . . . Although [plaintiff] was entitled to earn increased pension benefits so long as he remained in state employment . . . , plaintiff had no vested contractual right to continue working for any specified period of time. . . . [¶] . . . ■■ 'The fact that a pension right is vested will not, of course, prevent its loss upon the occurrence of a condition subsequent such as lawful termination of employment before completion of the period of service designated in the pension plan.' [Citation.]" (*Miller, supra,* 18 Cal.3d at p. 817, italics added.) ■■ In such a situation, it is unnecessary to "undertake the method of analysis required by *Allen* and *Abbott* for determining whether the changes in the state's pension system were reasonable." (*Id.,* at p. 818.)

*Pasadena Police Officers Assn.* accurately states the law as expressed in *Miller* and *Betts, supra,* 21 Cal.3d 859. (147 Cal.App.3d at pp. 701-702.) In both *Pasadena Police Officers Assn.* and the instant matter, there is no question of a change in the duration or any term of employment except the pension benefits to be afforded the plaintiffs. Without question, a reduction in the cost of living adjustments to pension benefits does not impose a condition subsequent which affects the maturation of the plaintiffs' pension rights, but burdens them with a disadvantage. It is equally clear charter

amendment H affords plaintiffs no comparable advantage. It neither reduces the contributions they must make from their salaries (see, e.g., *Houghton* v. *City of Long Beach* (1958) 164 Cal.App.2d 298, 311-312 [330 P.2d 918]) nor confers on them any new advantage. This, too, is the conclusion reached in *Pasadena Police Officers Assn., supra,* 147 Cal.App.3d at p. 702.)

Notwithstanding the clarity of the law as expressed in *Miller* v. *State of California, supra,* 18 Cal.3d 808 and *Betts* v. *Board of Administration, supra,* 21 Cal.3d 859 and accurately applied in *Pasadena Police Officers Assn.,* defendants insist preexisting law is contrary to that expressed in *Pasadena Police Officers Assn.* and is instead embodied in *Houghton* v. *City of Long Beach, supra,* 164 Cal.App.2d 298. *Houghton* considers a 1945 charter amendment by which the city attempted to repeal all police and firefighter pensions. The amendment permitted a member of the pension system who, on its effective date, had served for 20 years (the first point at which a pension was payable) or more to retire within five years and receive a pension based on his years of service to the effective date of the amendment. (*Id.,* at pp. 306-307.) This particular aspect of the amendment had been held valid in three previous decisions, beginning with *Palaske* v. *City of Long Beach* (1949) 93 Cal.App.2d 120 [208 P.2d 764] and continuing through *Allen* v. *City of Long Beach* (1950) 101 Cal.App.2d 15 [224 P.2d 792] and *Allstot* v. *City of Long Beach* (1951) 104 Cal.App.2d 441 [231 P.2d 498].

In *Houghton,* plaintiffs argued the preceding decisions had been implicitly overruled by *Allen* v. *City of Long Beach, supra,* 45 Cal.2d 128 [287 P.2d 765]. *Houghton* rejects this position, correctly noting the Supreme Court case dealt with entirely separate portions of the amendment and distinguished the earlier appellate cases. (164 Cal.App.2d at pp. 309-310.) The three earlier cases relied on *Kern* v. *City of Long Beach* (1947) 29 Cal.2d 848 [179 P.2d 799]. *Palaske* concludes, "the employee has a vested right only to a substantial or reasonable pension. His contractual right to such a pension has not been impaired by legislation which, operating prospectively, merely withdraws any right or option to earn a bonus by continuing in employment after he has become eligible for retirement." (93 Cal.App.2d at p. 132.) *Houghton* follows this reasoning and the *Palaske* line of cases in part because the city long had relied on these decisions. (164 Cal.App.2d at p. 311.) However, the court also notes, without labeling it as such, the comparable advantage plaintiffs gained for suffering the disadvantage worked by the amendment, i.e., they were not required after the effective date of the amendment to contribute 2 percent of their salaries to the pension fund. (*Id.,* at pp. 311-312.) Clearly, the case is correctly decided on this basis in

accord with the principles set forth in *Allen* v. *City of Long Beach, supra,* 45 Cal.2d 128.

*Pasadena Police Officers Assn.* reaches a different conclusion, finding "the *Palaske* line of cases cannot be reconciled with the comparable new advantages test of *Allen* and subsequent cases." (147 Cal.App.3d at p. 705.) While we disagree, the foregoing conclusion is not necessary to the decision in *Pasadena Police Officers Assn.* Moreover, it neither makes the case "bad law" nor conflicts with preexisting law. If defendants did indeed rely on *Houghton,* they did so without justification and with unequivocal disregard for the law as it is expressed in *Miller* v. *State of California, supra,* 18 Cal.3d 808 and *Betts* v. *Board of Administraton, supra,* 21 Cal.3d 859.

Defendants also argue *Pasadena Police Officers Assn.* is an anomaly in the law, in that an employee's rights to compensation are set by the law applicable at the time his or her services are rendered. (*Longshore* v. *County of Ventura* (1979) 25 Cal.3d 14, 23 [157 Cal.Rptr. 706, 598 P.2d 866].) *Longshore* deals with direct, not deferred, compensation and an attempt to claim retroactively the benefit of a subsequently-enacted ordinance to receive money in lieu of compensatory time off for overtime hours worked. (*Ibid.*) ■ It is well settled that a public employer is constitutionally prohibited from awarding compensation retroactively. (*Ibid.*) ■ As explained *ante,* all terms of public employment other than pension rights, including hours to be compensated, are wholly a matter of statute. (*Miller* v. *State of California, supra,* 18 Cal.3d at pp. 813-814.) These aspects of public employment ripen into obligations protected by the contract clause of the federal and state Constitutions only upon an employee's actual performance. (*Longshore, supra,* at p. 23.) In contrast, deferred compensation in the form of pension rights has the status of a contractual obligation from the moment one accepts public employment. (*Miller, supra,* at pp. 814, 817.) If this creates an anomaly in the law, it is one sanctioned by the California Supreme Court.

■ Defendants next argue, even if vested contractual rights are at issue, charter amendment H was permissible, in that plaintiffs' contract with the city has not been breached. Defendants rely on *International Assn. of Firefighters* v. *City of San Diego* (1983) 34 Cal.3d 292 [193 Cal.Rptr. 871, 667 P.2d 675] for this proposition. *International Assn. of Firefighters* deals with a public employer's attempt to raise the contribution rate required of its firefighter members in support of an actuarially based retirement system.

The Supreme Court examines the prior case law relating to vested pension rights noting: "What distinguishes each of these cases from the one

before us is the nature of the contractual rights which became vested in plaintiff's members upon their acceptance [or continuation] of employment. In the cases relied upon by plaintiff, employees' vested contractual rights were modified by amendment of the controlling provisions of the retirement system in question to reduce (or abolish) the net benefit available to the employees. In the present case, no modification was made in the retirement system; instead, the revision[s] . . . were made *pursuant to* the charter and ordinances which delineate City's retirement system and prescribe the employees' vested rights." (34 Cal.3d at p. 302, italics original.) Clearly, the instant matter falls into the former category and not the latter. *International Assn. of Firefighters* thus is of no assistance to defendants.

Defendants also rely on the following well-settled principle of contract law: "[I]f it appears that the parties contracted in contemplation of the continued existence of a thing, so that, reasonably construed, the contract requires that thing to be in existence, its destruction or such impairment as makes it unavailable excuses the promisor, unless he has in the contract assumed the risk of its destruction." (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 785, p. 708, italics deleted.) It is defendants' position that the charter provisions establishing articles XVII and XVIII in 1966 and uncapping the cost of living adjustment in 1971 were enacted in contemplation of the continued existence of specific funding through increases in the property tax levies, a prospect which evaporated upon the enactment of Proposition 13 and its limitations on real property taxes. They view charter sections 186.2 and 190.09 as demonstrating this reliance.

Sections 186.2 and 190.09 provide that the city council or controller annually shall "levy, in addition to all other taxes levied by the City, a tax clearly sufficient to provide the total amount of all items in [the pension system] budget." ■ To levy is simply to impose or collect a tax—any tax. (Webster's New Collegiate Dict. (6th ed. 1979) p. 655, col. 2.) ■ Nothing in the language of these charter sections limits the source of revenue to property taxes (indeed, the sections refer to *"all* other taxes") and, contrary to defendants' assertion, *McAlpine* v. *Baumgartner* (1937) 10 Cal.2d 409 [74 P.2d 753] does *not* construe similar language as so limited. This language clearly creates a general funding obligation, not a specific one. ■ In any event, the passage of Proposition 13 did not impair the city's ability to levy an additional property tax to meet this pre-1978 voter-approved indebtedness. (*Carman* v. *Alvord, supra,* 31 Cal.3d at p. 322.)

■ In view of the foregoing conclusions, it is clear the city's ability to meet its obligation to fund the pension systems remained unimpaired, notwithstanding Proposition 13. Hence, the passage of Proposition 13 did not

make unavailable an item specifically contemplated as continuing in existence. It necessarily follows that this event could not serve to excuse the city's contractual obligations to plaintiffs. ■ As *Pasadena Police Officers Assn.* v. *City of Pasadena, supra,* 147 Cal.App.3d notes at page 704, footnote 3, it is settled law that, "in the absence of a clear and unequivocal declaration in the pension provisions that benefits are payable only to the extent of available funds from specified contributions, the liability to pay promised pension benefits is a general obligation of the city." (Accord, *Bellus* v. *City of Eureka* (1968) 69 Cal.2d 336, 348-352 [71 Cal.Rptr. 135, 444 P.2d 711].)

■ Defendants further rely on the principle that any contract incorporates the law existing as of the time of its formation, i.e., the nature and extent of the obligation "must be ascertained not only from the language of the pension provisions but also from the judicial construction of this or similar legislation at the time the contractual relationship was established." (*Kern* v. *City Long Beach, supra,* 29 Cal.2d at p. 850; see also *City of Torrance* v. *Workers' Comp. Appeals Bd.* (1982) 32 Cal.3d 111, 378 [185 Cal.Rptr. 645, 650 P.2d 1162].) Their reliance is misplaced. As noted *ante,* the applicable law is embodied in *Miller* v. *State of California, supra,* 18 Cal.3d 808 and *Betts* v. *Board of Administration, supra,* 21 Cal.3d 859, *not* in *Houghton* v. *City of Long Beach, supra,* 164 Cal.App.2d 298.

Finally, defendants argue charter amendment H cannot be viewed as "substantially" impairing plaintiffs' vested rights, in that their reasonable expectations have not been defeated; thus, it is not subject to attack under the contract clause even though it technically alters a contractual obligation. (*Allen* v. *Board of Administration* (1983) 34 Cal.3d 114, 124 [192 Cal Rptr. 762, 665 P.2d 534].) Defendants note it is entirely permissible to adjust a contract to prevent a party from receiving a windfall profit (*Energy Reserves Group* v. *Kansas Power & Light* (1983) 459 U.S. 400, 412 [74 L.Ed.2d 569, 581, 103 S.Ct. 697]), and take the position those system members who became public employees prior to 1971 received just that from the uncapping of the cost of living adjustment.

Again it is clear this argument will not withstand scrutiny. ■ As noted *ante,* plaintiffs have a vested right not only to benefits substantially similar to those in effect when they accepted public employment (*Carman* v. *Alvord, supra,* 31 Cal.3d at p. 325; *Miller* v. *State of California, supra,* 18 Cal.3d at p. 817), but also to additional benefits offered later by the public employer (*Betts* v. *Board of Administration, supra,* 21 Cal.3d at p. 866). ■ Accordingly, those system members who accepted public employment prior to 1971 have *not* received a "windfall profit" from the uncapping

of the cost of living adjustment in 1971, but only their due. While it is true reasonable contractual expectations generally are to be measured as of the date the contractual relationship began (*Allen* v. *Board of Administration, supra,* 34 Cal.3d at pp. 124-125), the contractual relationship at issue here was modified by uncapping of the cost of living adjustment in 1971. Thus, in accord with *Betts, supra,* the reasonable expectations of plaintiffs in the instant matter must be measured as of that date.

In defendants' eyes, plaintiffs could have had only one reasonable post-1971 expectation—that their standard of living in retirement, despite inflation, would be as high as their standard of living during their terms of active service. This utterly misconstrues the city's retirement system. The expectation defendants describe as reasonable would, in truth, be wholly unreasonable. Plaintiffs do not now and never have had an opportunity to earn a pension equivalent to their salaries upon retirement; the opportunity is limited to a minimum pension benefit of 40 percent of salary and a maximum benefit of 70 percent. It is clear plaintiffs must expect a postretirement diminution in their standard of living. However, once the cost of living adjustment was uncapped in 1971, plaintiffs did have a reasonable expectation that pension benefits earned thereafter would be fully adjusted for inflation and their post-retirement standards of living thus would be protected from any *further* diminution. ██ ██ ██ ██ ██ Without question, charter amendment H defeats this expectation.[4] Moreover, the modification embodied in charter amendment H is *not* consistent with existing state law and thus cannot be viewed as working no substantial impairment of plaintiffs' reasonable expectations. (Cf. *City of Torrance* v. *Workers' Comp. Appeals Bd., supra,* 32 Cal.3d at p. 378.)

## II

Defendants further contend the trial court applied the wrong legal standard in determining whether charter amendment H impermissibly violated the contract clause. Again, we disagree.

---

[4] Defendants claim to have evidence, in the form of an economic analysis by Professor Shoven, which was erroneously excluded at trial, which demonstrates the standard of living of a retired police officer or firefighter throughout retirement would be higher than in his or her last year of active service—even after allowing for the effect of charter amendment H. The assertion that exclusion of this evidence was erroneous is made in passing, without legal argument, the citation of authority or explication of the ground upon which the evidence was excluded. Therefore, the point properly may be deemed waived on appeal. (*Henderson* v. *Security Nat. Bank* (1977) 72 Cal.App.3d 764, 769 [140 Cal.Rptr. 388].) In any event, the proposition this evidence purportedly "proves" is impossible. There is no conceivable way in which an officer retiring on 40 to 70 percent of his or her salary and thereafter receiving cost of living adjustments equal only to actual inflation in that cost *ever* could equal, let alone exceed, the standard of living he or she enjoyed in the last year of active service.

A law or ordinance which substantially impairs a contractual obligation nonetheless may be constitutional. As the United States Supreme Court has noted, "[a]lthough the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.' [Citing *Home Bldg. & Loan Assn.* v. *Blaisdell* (1934) 290 U.S. 398, 434 (78 L.Ed. 413, 426-427, 54 S.Ct. 231).] In *Blaisdell,* the Court . . . balanced the language of the Contract Clause against the State's interest in exercising its police power . . . . [The Court listed five factors that were then deemed to be significant in its analysis: whether the Act (1) was an emergency measure; (2) was one to protect a basic societal interest, rather than particular individuals; (3) was tailored appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration of the emergency. (Citation.)]" (*Energy Reserves Group* v. *Kansas Power & Light, supra,* 459 U.S. at p. 410 and fn. 11 [74 L.Ed.2d at p. 580].)

*Energy Reserves Group* continues: "The threshold inquiry is 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.' [Citing *Allied Structural Steel Co.* v. *Spannaus* (1978) 438 U.S. 234, 244 (57 L.Ed.2d 727, 736, 98 S.Ct. 2716) and *United States Trust Co.* v. *New Jersey* (1977) 431 U.S. 1, 17 (52 L.Ed.2d 92, 106, 97 S.Ct. 1505).] The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected. [Citing *Allied Structural Steel Co., supra,* at p. 245 (57 L.Ed.2d at p. 737).] Total destruction of contractual expectations is not necessary for a finding of substantial impairment. [Citing *United States Trust Co., supra,* at pp. 26-27 (52 L.Ed.2d at p. 106).] On the other hand, state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment. [Citing 431 U.S. at p. 31 (52 L.Ed.2d at p. 115) and *El Paso* v. *Simmons* (1965) 379 U.S. 497, 515 (13 L.Ed.2d 446, 458, 85 S.Ct. 577).] . . .

"If the State regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation [citing *United States Trust Co.* v. *New Jersey, supra,* 431 U.S. at p. 22 (52 L.Ed.2d at p. 109)], such as the remedying of a broad and general social or economic problem. [Citing *Allied Structural Steel Co.* v. *Spannaus, supra,* 438 U.S. at pp. 247, 249 (57 L.Ed.2d at pp. 738-739).] Furthermore, since *Blaisdell,* the Court has indicated that the public purpose need not be addressed to an emergency or temporary situation. [Citing *United States Trust Co., supra,* at p. 22, fn. 19 (52 L.Ed.2d at p. 110) and *Veix* v. *Sixth Ward Assn.* (1940) 310 U.S. 32, 39-40 (84 L.Ed. 1061, 1066-1067, 60 S.Ct. 792).] . . . The requirement of a legitimate public purpose

guarantees that the State is exercising its police power, rather than providing a benefit to special interests.

 ■■■■ "Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.' [Citing *United States Trust Co.* v. *New Jersey, supra,* 431 U.S. at p. 22 (52 L.Ed.2d at pp. 109-110).] *Unless the State itself is a contracting party* [citing 431 U.S. at p. 23 (52 L.Ed.2d at p. 110)], '[a]s is customary in reviewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.' [Citing 431 U.S. at pp. 22-23 (52 L.Ed.2d at pp. 109-110).] [When a State itself enters into a contract, it cannot simply walk away from its financial obligations. In almost every case, the Court has held a governmental unit to its contractual obligations when it enters financial *or other* markets. (Citations.) ■■■■ When the State is a party to the contract, 'complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake.' (Citing 431 U.S. at p. 26 (52 L.Ed.2d at p. 112).]" (459 U.S. at pp. 411-413 and fn. 14 [74 L.Ed.2d at pp. 580-581], italics added, some fns. omitted.)

 In other words, "[a] governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all." (*United States Trust Co.* v. *New Jersey, supra,* 431 U.S. at p. 26 [52 L.Ed.2d at p. 112].) Therefore, the existence of an important public purpose is not necessarily enough in itself to justify a substantial contractual impairment. (*Id.,* at p. 21 [52 L.Ed.2d at p. 109].) It is settled that governmental entities are bound by their debt obligations. (*Id.,* at p. 24 [52 L.Ed.2d at p. 111].) Thus, "a State cannot refuse to meet its legitimate financial obligations simply because it would prefer to spend the money to promote the public good rather than the private welfare of its creditors. [A court] can only sustain [an impairment] if that impairment [is] both reasonable and necessary to serve the . . . important purposes claimed by the State." (*Id.,* at p. 29 [52 L.Ed.2d at p. 114]; *Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296, 307-308 [152 Cal.Rptr. 903, 591 P.2d 1].)

 A determination of necessity requires an evaluation of whether a less drastic modification of the contractual obligation or other steps which entailed no modification would have permitted the governmental entity to

meet its goals, for "a State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives. Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." (*United States Trust Co.* v. *New Jersey, supra,* 431 U.S. at pp. 30-31 [52 L.Ed.2d at p. 115].) In addition, a change of circumstances will not justify a substantial impairment unless it was unforeseen and unforeseeable. (*Id.,* at pp. 31-32 [52 L.Ed.2d at pp. 115-116]; *Sonoma County Organization of Public Employees* v. *County of Sonoma, supra,* 23 Cal.3d at p. 308.)

■ Where a change in law works "a 'severe, permanent and immediate change'" in contractual rights, an assessment of constitutionality requires "'a careful examination of . . . [its] nature and purpose.'" (*Id.,* at p. 309, quoting from *Allied Structural Steel Co.* v. *Spannaus, supra,* 438 U.S. at pp. 245, 250 [57 L.Ed.2d at pp. 737, 740].) ■ In these circumstances, the impairment requires a "compelling state interest," as well as necessity. (See, e.g., 438 U.S. at pp. 242, 247 [57 L.Ed.2d at pp. 735, 738].) Only the minimal impairment necessary to attain the governmental entity's proposed legitimate end may be visited upon parties to contracts. However, this concept "has no proper application as a vague license for the state to impair its obligation so long as it is only 'a little bit.'" (*California Teachers Assn.* v. *Cory* (1984) 155 Cal.App.3d 494, 511 [202 Cal.Rptr. 611].)

■ Defendants contend the trial court erroneously relied on the five factors identified in *Home Bldg. & Loan Assn.* v. *Blaisdell, supra,* 290 U.S. 398, instead of assessing whether charter amendment H is reasonable and necessary to serve legitimate and important public purposes identified by defendants (*United States Trust Co.* v. *New Jersey, supra,* 431 U.S. at p. 29 [52 L.Ed.2d at p. 114]). In particular, they point to the court's finding that defendants had not met their burden of proving the enactment of charter amendment H was justified by an emergency or serious fiscal crisis. What defendants overlook is that they in large part *relied* on the existence of such an emergency or fiscal crisis.

Defendants argued the charter amendment was reasonable and necessary to effect the following public purposes: (1) preserve the city's financial soundness by reducing public spending on pension costs, (2) enhance the ability to predict and plan for long-range city budgeting and financing, (3) enable the city to continue providing essential public services, (4) preserve the soundness and integrity of the pension system itself and (5) respond to the declining morale of noncovered public employees. Purposes (1), (3) and (4) clearly portend the imminence of an emergency or serious fiscal crisis in this particular context.

Defendants took the position that unexpected and unforeseen increases in the rate of inflation had caused pension costs to escalate sharply, exceeding salary increases, the enactment of Proposition 13 destroyed the traditional funding mechanism for the pension systems and these factors combined to create a budgetary crisis in an era of increasingly scarce sources of public revenue. ■■■ The trial court first noted the established principle that a desire to reduce costs or limit public spending does not justify the abrogation or impairment of a public entity's contractual obligations notwithstanding the legitimacy of such a public purpose. (*Lynch* v. *United States* (1934) 292 U.S. 571, 580 [78 L.Ed. 1434, 1441, 54 S.Ct. 840], cited with approval in *United States Trust Co.* v. *New Jersey, supra,* 431 U.S. at p. 26, fn. 25 [52 L.Ed.2d at p. 112]; *Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 455 [326 P.2d 484]; *Larionoff* v. *United States* (D.C. Cir. 1976) 533 F.2d 1167, 1179-1180; see also *Continental Ill. Nat. Bank, Etc.* v. *State of Wash.* (9th Cir. 1983) 696 F.2d 692, 702, appeal dism. (1983) 460 U.S. 1077 [76 L.Ed.2d 338, 103 S.Ct. 1762].) Thereafter, the court examined the evidentiary underpinnings of defendants' stance.

The court noted the evidence established that the growth of the pension systems' unfunded liabilities to $3.37 billion occurred primarily because defendants took a number of actions which failed to conform to sound actuarial practice in the area of pension funding. Specifically, the article XVII pension system had been funded on a "pay-as-you-go" basis from 1923 until 1959. Consequently, when the article XVIII pension system was created in 1967, it had unfunded liabilities of $258 million from the outset. In addition, the initial amortization period of 50 years during which to retire unfunded liabilities, which was adopted in 1959, was changed to a period of 70 years in 1967, thereby decreasing the stability of the pension systems.

For many years, the pension board failed to assume realistic projections of annual increases in the Consumer Price Index and failed to consider at all the impact of active pension system members' annual salary increases. Further, when the pension board began in 1976 to factor projected salary increases into its actuarial funding evaluations, it failed to make realistic assumptions concerning such increases. Finally, in 1976, defendants decided to change the city's contributions to the pension systems from a level dollar amount to a payroll percentage; this led to a short-term reduction in the size of the contributions to the pension system, but in the long run *increased* the required level of contribution.

Based on the evidence, the trial court thus concluded any instability or loss of integrity and soundness in the pension systems resulted principally

from the foregoing acts and omissions, *not* from full cost of living adjustments indexed to the Consumer Price Index. Since the latter did not *cause* the problem, the trial court reasonably inferred capping the cost of living adjustment at 3 percent could not sensibly be viewed as a *cure* for the problem, in that a public entity cannot justify the impairment of its contractual obligations on the basis of the existence of a fiscal crisis created by its own voluntary conduct. (See *Sonoma County Organization of Public Employees* v. *County of Sonoma, supra,* 23 Cal.3d at p. 313.) This conclusion was buttressed by evidence which indicated funding a full cost of living adjustment would require $43 million in additional annual funding, which amounted to less than 1 percent of the city's total budget and less than 2 percent of the city's general budget.

Moreover, the trial court correctly recognized that charter amendment H bears no material relation to the theory of a pension system and its successful operation. ▆▆ Basically, the theory of a pension system is affording retirees with a reasonable degree of economic security (*Hittle* v. *Santa Barbara County Employees Retirement Assn., supra,* 39 Cal.3d at p. 390) and the sole legitimate purpose of a cost of living adjustment is the preservation of a retiree's standard of living (*Allen* v. *Board of Administration, supra,* 34 Cal.3d at p. 122). ▆▆ Charter amendment H has no tendency to effectuate these aims; rather, it lessens a retiree's economic security, impairing rather than preserving his or her standard of living. Neither does it have any particular relation to the successful operation of the pension systems. While it reduces the benefits which must be paid, it in no manner enhances the integrity or soundness of the funds, for it does not require the maintenance of the same or a similar level of funding. Indeed, after the enactment of charter amendment H, defendants contributed to the pension systems no portion of the additional $43 million which otherwise would be required annually to fully fund a Consumer Price Index-related cost of living adjustment; instead, they either spent this sum on other items or added it to the city's general reserve fund. The amendment's lack of any material relation to the theory of a pension system or its successful operation clearly supports the conclusion it was neither reasonable nor necessary to the maintenance of the integrity and soundness of the pension systems.

The trial court also noted that the chief administrative officer had recommended against uncapping the cost of living adjustment in 1971, pointing out the risk of introducing budgeting unpredictability due to the fluctuating, cyclical nature of inflation. City officials acknowledged this and admitted they chose to assume the risk. Hence, the evidence clearly establishes the escalating cost of living adjustments caused by the ensuing rises in the rate of inflation was not an unforeseen and unforeseeable change in circum-

stances. Inasmuch as it was not unforeseen and the change in circumstances was "of degree and not kind," the enactment of charter amendment H was not justified on this ground as a reasonable response to the problem. (*United States Trust Co.* v. *New Jersey, supra,* 431 U.S. at p. 31 [52 L.Ed.2d at p. 115]; *Sonoma County Organization of Public Employees* v. *County of Sonoma, supra,* 23 Cal.3d at p. 308; *Continental Ill. Nat. Bank, Etc.* v. *State of Wash., supra,* 696 F.2d at p. 702.)

 As to the passage of Proposition 13, contrary to defendants' stance, this did not impair their ability to assess an ad valorem property tax to meet the funding requirements of the pension funds. (*Carman* v. *Alvord, supra,* 31 Cal.3d at pp. 332, 333-334.) This was a settled question of law in 1981, prior to the placement of charter amendment H on the ballot. Moreover, as the trial court noted, the passage of Proposition 13 was itself state action and thus could not constitutionally disable defendants from paying the city's legitimate legal obligations by depriving them of the taxing power necessary to raise the required funds. (*Louisiana* ex rel. *Hubert* v. *New Orleans* (1909) 215 U.S. 170, 175-176 [54 L.Ed. 144, 147-148, 30 S.Ct. 40]; see also *United States Trust Co.* v. *New Jersey, supra,* 431 U.S. at p. 24, fn. 22 [52 L.Ed.2d at p. 111].) Hence, however unforeseen and unforeseeable it might have been, the passage of Proposition 13 cannot reasonably be viewed as creating a fiscal crisis which justified the impairment of the city's contractual obligations.[5]

 At this point, it is clear the trial court was eminently justified in concluding defendants had failed to carry their burden of proving the existence of a genuine emergency or severe fiscal crisis of a sort which reasonably and necessarily would be ameliorated by the enactment of charter amendment H. Defendants' proffered "important public purposes" thus are reduced to three: their desire to (1) spend city revenues on other things they deemed more important, (2) enhance the ability to predict and plan for long-range city budgeting and financing and (3) respond to the declining morale of noncovered city employees. The first never justifies the impairment of a public entity's contractual obligations (*United States Trust Co.* v. *New Jersey, supra,* 431 U.S. at p. 26 [52 L.Ed.2d at p. 112]) and neither does the third (*Allen* v. *City of Long Beach, supra,* 45 Cal.2d at p. 133). This leaves only the second proffered purpose.

---

[5] Defendants argue Revenue and Taxation Code sections 97.2 and 97.6 (enacted by Stats. 1983, ch. 491, §§ 1, 3) cut off this avenue of financing. This is not at all clear (see Rev. & Tax. Code, § 97.65) and, in any event, were it the case, these code sections would be subject to the same constitutional objection as is article XIIIA of the California Constitution (Proposition 13) itself.

Unquestionably, enhancing the ability to predict and plan for long-range city budgeting and financing is an important public purpose. However, as the trial court recognized, when the city's own contractual obligation is at issue and the impairment is severe, it is not enough that city officials reached the conclusion the enactment of charter amendment H was reasonable and necessary to achieve that purpose; this judgment must be subjected to careful scrutiny. (*Energy Reserves Group* v. *Kansas Power & Light, supra,* 459 U.S. at pp. 411, 412-413, fn. 14 [74 L.Ed.2d at pp. 580-581]; *Allied Structural Steel Co.* v. *Spannaus, supra,* 438 U.S. at p. 245 [57 L.Ed.2d at p. 737]; *Sonoma County Organization of Public Employees* v. *County of Sonoma, supra,* 23 Cal.3d at p. 309.)[6]

 Where an enactment appears to be somewhat narrowly tailored to modify a particular contractual obligation, rather than to be part of a broad public program which incidentally has the effect of impairing the particular contract, it fails the test. (See, e.g., *Continental Ill. Nat. Bank, Etc.* v. *State of Wash., supra,* 696 F.2d at p. 702.) This is the case here, particularly since the passage of Proposition 13 did not in fact impair defendants' ability to levy a separate ad valorem property tax specifically to meet the pension system funding requirements. Further, in adopting cost-cutting measures to further an important public purpose, there must be some indication the public entity has given considered thought to the severity of the effect an enactment might have on the particular contractual scheme at issue and to the possibility of alternative, less drastic, means of accomplishing the public goal. (*Valdes* v. *Cory* (1983) 139 Cal.App.3d 773, 791 [189 Cal.Rptr. 212]; see also *United States Trust Co* v. *New Jersey, supra,* 431 U.S. at p. 30 [52 L.Ed.2d at pp. 114-115].) Here, there is no such indication.

Notwithstanding the foregoing, defendants rely heavily on *Md. State Teachers Ass'n.* v. *Hughes* (D.Md. 1984) 594 F.Supp. 1353, which they view as squarely on point with the instant matter. Of course, even if that view were correct, a decision of a federal district court has no precedential value in this court; at best, it is persuasive authority only. (*Rohr Aircraft Corp.* v. *County of San Diego* (1959) 51 Cal.2d 759, 764 [336 P.2d 521]; *Debtor Reorganizers, Inc.* v. *State Bd. of Equalization* (1976) 58 Cal.App.3d 691, 696 [130 Cal.Rptr. 64].)

 More importantly, *Md. State Teachers Ass'n.* clearly is distinguishable from this case. The original Maryland retirement system provided full postretirement cost of living adjustments and other defined benefits in

---

[6] This disposes of defendants' claim that the trial court failed to give appropriate deference to defendants' conclusions.

exchange for required contributions of 5 percent of salary. In 1979, Maryland created a two-tiered retirement system. An employee could elect to transfer to a new pension system, which capped cost of living adjustments at 3 percent; if the employee did so, he or she would not be required to make any contributions from salary except to the extent the salary exceeded the Social Security wage base. An employee who elected to remain in the present pension system retained fully indexed cost of living adjustments and continued to make contributions of 5 percent of salary. In 1984, Maryland offered four retirement benefit options: (1) transfer to the pension system created in 1979 with a partial refund of the employee's contributions; (2) a bifurcation under which an employee retained fully indexed cost of living adjustments to the effective date of the legislation and thereafter accrued benefits with a 3 percent cost of living adjustment cap, in which event future contributions would be required only from salary which exceeded the Social Security wage base; (3) the retention of past and future credits in the retirement system, all subject to a 5 percent cost of living adjustment cap and to contributions of 5 percent of salary or (4) the retention of a fully indexed cost of living adjustment with an increase in required salary contributions from 5 to 7 percent. (594 F.Supp. at pp. 1357-1358.)

Under Maryland law, future pension benefits vest as they are *proratedly earned*. (*Id.,* at pp. 1362-1363; *City of Frederick* v. *Quinn* (1977) 35 Md.App. 626 [371 A.2d 724, 726].) This is contrary to California law. (*Miller* v. *State of California, supra,* 18 Cal.3d at p. 817; accord, *Carman* v. *Alvord, supra,* 31 Cal.3d at p. 325.) Moreover, in Maryland, a governmental entity may modify benefits not only if there is an offsetting new benefit or liberalized qualifying condition, as in California, but also if the modification is justified by countervailing public welfare equities. (*Md. State Teachers Ass'n.* v. *Hughes, supra,* 594 F.Supp. at p. 1362; *City of Frederick* v. *Quinn, supra,* 371 A.2d at p. 726.) Based on the foregoing, the district court concludes, "the challenged legislation does *not* operate to deny vested or merely earned pension rights retroactively." (*Md. State Teachers Ass'n., supra,* at p. 1363, italics original.) Again, this is contrary to California law. (*Pasadena Police Officers Assn.* v. *City of Pasadena,* supra, 147 Cal.App.3d at pp. 701-702.)

Given this analysis, it is apparent the district court's subsequent conclusions that, *if* any vested contractual rights were impaired, there was no need to apply heightened scrutiny to the state's asserted justification and the modifications were reasonable and necessary to accomplish important public purposes (*Md. State Teachers Ass'n., supra,* 594 F.Supp. at pp. 1370-1372) are at most dicta. Moreover, the former conclusion clearly is erroneous (see *Allied Structural Steel Co.* v. *Spannaus, supra,* 438 U.S. at p. 245

[57 L.Ed.2d at p. 737]) and, in view of that error, the latter dictum has little persuasive force.

In sum, we conclude the trial court applied the correct legal standards and reasonably found defendants failed to justify the impairment of plaintiffs' contractual rights. Accordingly, there is no error requiring reversal.

Defendants make similar arguments concerning the proration provision of charter amendment H. Prior to the enactment of charter amendment H, the pension board met each year and determined the percentage by which the Consumer Price Index had increased during the 12 months preceding March 1, then adjusted the pensions of retired members by this percentage, effective July 1, the beginning of the next fiscal year. The proration provision of charter amendment H ended this practice. Instead, the cost of living adjustment would be prorated according to the number of months since January 1 of each year an employee retiring in that calendar year had been retired.

Defendants argue this provision of charter amendment H did nothing but deprive retiring employees of a windfall. As they perceive matters, the mechanics of the former system produced an obvious abuse: An employee could retire on June 1, collect a pension for one month at the existing rate, and then collect a cost of living adjusted pension effective July 1 even though the employee had not retired prior to the March 1 evaluation date. Defendants' misperception is based upon an erroneous analysis of the city's fiscal operation.

The city's budget covers a fiscal year extending from July 1 to June 30; thus, any cost of living adjustments to pensions necessarily must become operative at the beginning of each budgetary period, i.e., each fiscal year. Such an increase is intended to compensate for the decrease in purchasing power which has occurred during the preceding fiscal year. However, it takes time to collect, absorb and process data concerning the rate of inflation. This results in a time lag of approximately four months. Were the pension board to wait until data to June 1 was available, there would be insufficient time to include adjustments in the budget to become effective on July 1. This, however, results in no windfall to retirees.

An employee retiring at any point in any particular fiscal year receives pension benefits entirely unadjusted for the creeping effects of inflation during that fiscal year. It is only during the second fiscal year of retirement that an employee receives an adjustment for the diminution in purchasing power that occurred in the *preceding year*. Rather than receiving a windfall,

such an employee then receives *less* than a full adjustment for the preceding fiscal year's diminution in the purchasing power of the pension. Since the proration provision of charter amendment H clearly does not serve to eliminate a "windfall," it is no less constitutionally defective than the remainder of the charter amendment.

The judgment is affirmed.

Devich, J., and Ortega, J., concurred.

A petition for a rehearing was denied May 22, 1989, and appellant's petition for review by the Supreme Court was denied July 19, 1989.