[No. C008704. Third Dist. Mar. 13, 1992.]

LAWRENCE E. WALSH, Plaintiff and Appellant, v.
BOARD OF ADMINISTRATION OF THE PUBLIC EMPLOYEES'
RETIREMENT SYSTEM, Defendant and Respondent.

684

## Counsel

Barbara Lang Betts for Plaintiff and Appellant.

Richard H. Koppes and Margaret J. Hoehn for Defendant and Respondent.

## Opinion

**SPARKS, Acting P. J.**—Once again we consider claims that changes in the Legislators' Retirement Law were improper and impaired the vested rights of a former legislator. Lawrence E. Walsh, a former member of the California State Legislature, appeals from a judgment of the Superior Court of Sacramento County denying his petition for a writ of mandate. By his petition Walsh sought to compel the defendant Board of Administration of the Public Employees' Retirement System (PERS Board) to award him retirement benefits from the time he left legislative service in 1974 to the time he began drawing retirement benefits at age 60 in 1986, and to recalculate his current allowance based upon the cost of living increases that would have accrued during those years. Walsh's contentions are presented in a somewhat disjointed fashion. Nevertheless, we have carefully considered each of the arguments which we perceive him to be asserting in support of his claim and find none of them persuasive. Accordingly, we shall affirm the judgment of the trial court.

### Background

The decade colloquially known as the '60's was an extremely significant, and turbulent, period for our state Legislature. In order to address the issues presented in this appeal and to gain perspective we must first briefly relate the historical background in which this dispute arose. From our point of view, the relevant historical perspective includes three subjects: (1) legislative reapportionment; (2) the change from a part-time to a full-time Legislature with compensatory adjustments; and (3) legislative retirement. We consider these in that order.

1. *Reapportionment.* We may begin our discussion of legislative reapportionment with the 1926 initiative amendment of article IV, section 6, of

the state Constitution (further references to articles are to the articles of the California Constitution). At that time our Constitution provided that the state should be divided into 40 Senate districts and 80 Assembly districts. The Senate was to be apportioned on a geographical basis and the Assembly on a modified population basis. The Constitution provided that Assembly districts should be "as nearly equal in population as may be" but also contained geographical limitations upon apportionment of such districts. With respect to Senate districts, the Constitution contained only geographical limitations.

In the 1926 measure it was provided that the Legislature should reapportion the state Senate and Assembly districts in its first regular session following each decennial federal census. In the event the Legislature failed to act, a Reapportionment Commission, consisting of the Lieutenant Governor, Attorney General, State Controller, Secretary of State, and State Superintendent of Public Instruction, was charged with the duty to make a reapportionment, subject to the right of referendum. (Former art. IV, § 6.)

The reapportionment scheme created by the 1926 measure was followed in 1928 and thence after each decennial federal census through 1961. (See *Yorty* v. *Anderson* (1963) 60 Cal.2d 312, 314 [33 Cal.Rptr. 97, 384 P.2d 417].) The geographical basis for Senate apportionment and, to a lesser but nonetheless significant extent, the modified population basis for Assembly apportionment, gave rise to large discrepancies in the population bases for the various legislative districts in the state. (See *Silver* v. *Brown* (1965) 63 Cal.2d 270, 275-276 [46 Cal.Rptr. 308, 405 P.2d 132].) For example, after the 1961 reapportionment the population bases of Assembly districts ranged from 72,105 to 306,191, and the population discrepancies in Senate districts were even more disparate. (*Ibid.*) Before 1962 this was not regarded as an impermissible result. In that year, however, the United States Supreme Court rendered its decision in *Baker* v. *Carr* (1962) 369 U.S. 186 [7 L.Ed.2d 663, 82 S.Ct. 691]. For our purposes it is sufficient to note that in the decision in *Baker* the Supreme Court held that the apportionment of a state legislature was subject to judicial challenge on equal protection grounds.

The decision in *Baker* generated several challenges to our reapportionment scheme. In *Yorty* v. *Anderson, supra,* 60 Cal.2d 312, the petitioners sought a writ of mandate to compel the Reapportionment Commission to reapportion state Senate districts upon the ground that the 1961 reapportionment by the Legislature was unconstitutional. The Supreme Court denied extraordinary relief, holding that since the Legislature had not failed to act with respect to the decennial reapportionment required in article IV, section 6 the jurisdiction of the Reapportionment Commission did not arise. (60 Cal.2d at p. 315.) The court noted that the reapportionment enacted by the Legislature was

subject to judicial attack and that in fact a federal action was then pending for that purpose. (*Id.* at p. 318.)

The federal action referred to in *Yorty* resulted in a determination that the 1961 Senate reapportionment was unconstitutional. (*Silver* v. *Jordan* (S.D.Cal. 1965) 241 F.Supp. 576.) The United States District Court deferred further action until after July 1, 1965, so that our Legislature would have an opportunity to reapportion the Senate consistent with equal protection principles. (*Ibid.*) The decision of the district court was affirmed by the United States Supreme Court. (*Jordan* v. *Silver* (1965) 381 U.S. 415 [14 L.Ed.2d 689, 85 S.Ct. 1572].)

In 1965 the state Legislature failed to enact a reapportionment of the Senate within the deadline set by the federal district court. Since the United States Supreme Court had indicated a preference that appropriate state agencies, including state courts, be given an opportunity to adopt valid reapportionment plans before intervention by federal courts, the California Supreme Court took jurisdiction over the matter in *Silver* v. *Brown, supra,* 63 Cal.2d 270 (see p. 275). The court held that the 1961 reapportionment of both the Senate and the Assembly failed to meet constitutional requirements. (*Id.* at pp. 276-277.) The court presented a contingent reapportionment plan to be used in the 1966 legislative elections in the event the Legislature failed to act. (*Id.* at p. 281.) However, the court noted that there was time for the Governor to call the Legislature into special session to enact a reapportionment plan for the 1966 elections, and the court held that in the event a valid plan was adopted by the Legislature then that plan would prevail. (*Id.* at pp. 277-278, 281.)

In response to the decision in *Silver* v. *Brown, supra* 63 Cal.2d at page 270 the Governor called the Legislature into extraordinary session and the Legislature enacted a reapportionment plan. While the Legislature was still in session certain technical errors were discovered and the Legislature passed a corrective bill. However, in the corrective bill the Legislature attempted to provide additional pension benefits to legislators affected by reapportionment. In view of the pension provisions, the Governor refused to sign the corrective bill and it did not take effect. In *Silver* v. *Brown* (1966) 63 Cal.2d 841 [48 Cal.Rptr. 609, 409 P.2d 689], the Supreme Court corrected the technical errors and ambiguities in the reapportionment plan as a matter of construction, and as corrected upheld the plan. (*Id.* at p. 846.)

As can be seen from this history, the 1966 legislative elections represented a major change in the way in which the members of our Legislature were chosen. For the first time the members of our Legislature were elected from

districts which were approximately equal in population size. As reflected in the first *Silver* v. *Brown* decision, *supra*, 63 Cal.2d at page 276, with respect to at least some members of the Legislature this had the effect of drastically altering the districts from which they had previously been elected.

2. *The Change to a Full-time Legislature.* Prior to 1966 our Constitution provided for what has been called a part-time or citizen Legislature. Former article IV, section 2, subdivision (a), provided for annual legislative sessions. Sessions in odd-numbered years were considered general sessions and were not permitted to exceed 120 days in duration. Sessions in even-numbered years were considered budget sessions and during such sessions the Legislature was permitted to consider only the budget bill, revenue acts necessary therefor, the approval or rejection of charters and charter amendments of local governments, and acts necessary to provide for the expenses of the session. Under subdivision (c), budget sessions were not permitted to exceed 30 days in duration, although during that time the Legislature was permitted to recess for 30 days to permit committee consideration of the budget bill. Subdivision (b) provided for legislative salaries of $500 per month during the term for which the member was elected.

In 1966, a constitutional revision was submitted to the voters for the purpose of converting the Legislature into what may be termed a full-time body. The ultimate proposal was the result of lengthy consideration by the Constitutional Revision Commission and the Legislature. The goal of this process was the conversion of the Legislature to a full-time body by means of a constitutional revision which would be palatable to the electorate. The measure which was ultimately proposed provided for the Legislature to meet annually in regular sessions without limitation either as to duration or to the matters which could be considered. (Art. IV, § 3, subd. (a).) The measure ratified a previously enacted statute raising legislative salaries from $6,000 to $16,000 per year. (Art. IV, § 4; art. XXII, § 6; Gov. Code, § 8901, Stats. 1966, First Ex. Sess., ch. 163, § 2, p. 721; see *Lyon* v. *Flournoy* (1969) 271 Cal.App.2d 774, 778 [76 Cal.Rptr. 869].) Thereafter the Legislature was permitted to increase salaries by statute, provided that such adjustments could not exceed 5 percent for each calendar year following the operative date of the last adjustment. (Art. IV, § 4.) This measure was adopted by the voters at the November 1966 election which, coincidentally, was the first legislative election held under the reapportionment made necessary by equal protection principles.

3. *Legislative Retirement.* The Legislators' Retirement Law (hereafter the LRL), was enacted in 1947, to be administered by the PERS Board. (Gov. Code, § 9350 et seq., Stats. 1947, ch. 879, § 1, pp. 2058-2065.) When

enacted there was some question as to the validity of the LRL, since the Constitution provided that legislators "shall receive no compensation for their services other than that fixed by the Constitution . . . ." ( Former art. IV, §§ 23, 23b.) Based upon an opinion of the Attorney General, the PERS Board refused to permit legislators to file elections to participate in the LRL. (See Stats. 1948, ch. 10, § 2, p. 13.) In *Knight* v. *Bd. etc. Employees' Retirement* (1948) 32 Cal.2d 400, at pages 402-403 [196 P.2d 547, 5 A.L.R.2d 410], the Supreme Court upheld the LRL. The court reasoned that former article IV, section 22a, which permitted the Legislature to provide for retirement for employees of the state, was sufficiently broad to include legislators and was an implied modification of sections 23 and 23b of article IV. (*Ibid.*)

Over the years the LRL was amended numerous times, generally to provide greater levels and/or different types of benefits for members. (See, e.g., Stats. 1949, ch. 1570, § 6, p. 2809; Stats. 1961, ch. 1897, §§ 1, 3, pp. 4005-4007 [adjustment of age and service requirements for retirement]; Stats. 1953, ch. 17, § 1, pp. 623-624; Stats. 1957, ch. 1871, § 1, pp. 3275-3276; Stats. 1959, ch. 2133, § 1, p. 5047; Stats. 1963, ch. 1597, § 1, p. 3175 [providing for and increasing death benefits]; Stats. 1957, ch. 1212, § 1, pp. 2496-2497; Stats. 1959, ch. 766, § 1, pp. 2752-2753 [increasing pension benefits]; Stats. 1957, ch. 1871, § 3, pp. 3276-3277 [providing for spousal and dependent benefits]; Stats. 1961, ch. 2123, § 1, pp. 4381-4382 [providing for disability benefits]; Stats. 1966 First Ex. Sess., ch. 152, § 1, p. 693 [providing for health and life insurance benefits].) During the first half of the 1960's the Legislature's frustrated desire for a salary increase and the turbulence occasioned by the judicially compelled reapportionment of legislative districts resulted in the enactment of two significant amendments of the LRL.

Prior to 1963, the basic means for adjusting legislative pensions to reflect changes in the cost of living consisted of tying such pensions to the salary of incumbent members of the Legislature. (See *Lyon* v. *Flournoy, supra,* 271 Cal.App.2d at p. 777.) At that time, the last salary increase for incumbents had been approved in 1953, to commence in 1954, when salaries were increased to $500 per month. By 1963 the voters had rejected four measures to increase legislative salaries. (*Id.* at pp. 784-785.) In 1963, in frustration over the voters' refusal to liberalize legislative salaries, the Legislature enacted a measure to provide for the adjustment of all legislative pensions to reflect increases in the federal cost-of-living indices since 1954, and thereafter to require annual adjustment. (Gov. Code, § 9360.9, Stats. 1963, ch. 2174, § 2, p. 4563.)

In 1965, confronted with judicially compelled reapportionment, the Legislature added section 9359.01 to the Government Code to provide: "A

Member of the Senate or Assembly who is not returned to office, or who chooses not to run, when the boundaries of the Senate or Assembly district, respectively, in which he was resident, when last elected to the Senate or Assembly, respectively, are altered pursuant to a reapportionment of legislative districts, may be retired, upon his written application to the board, at the conclusion of his current term provided the member is credited with a minimum of four years service." (Stats. 1965, ch. 688, § 1, pp. 2063-2064.) This provision was amended in 1969 to read: "A Member of the Senate or Assembly who is not returned to office, or who chooses not to run, when the boundaries of the Senate or Assembly district, respectively, in which he was resident, when last elected to the Senate or Assembly, respectively, are altered pursuant to a reapportionment of legislative districts, or who resigns his office upon election or appointment to another public office during the term in which the boundaries of the Senate or Assembly district, respectively, in which he was resident, when last elected to the Senate or Assembly, respectively, are altered pursuant to a reapportionment of legislative districts, may be retired, upon his written application to the board, at the conclusion of his current term provided the member is credited with a minimum of four years service. [¶] A written application for retirement may be filed at any time during the term of office of the member, or within thirty (30) days after the expiration of his term of office. Any application which does not specify a different date as the effective date of retirement applied for shall be deemed to be an application for retirement as of the day following the expiration of term of office of the member. [¶] This section shall not apply to persons first elected to the Senate or Assembly after December 31, 1969." (Stats. 1969, ch. 1582, § 1, pp. 3215-3216.)

The question of legislative retirement benefits was a major concern in seeking voter approval of the 1966 constitutional revision. In preparation for the constitutional revision the Legislature adopted Government Code section 9359.11, which would preclude any legislator whose service ended prior to the term which would begin in 1967 from receiving retirement benefits based upon a salary level in excess of $500 per month. The constitutional revision included a provision which stated: "The Legislature may not provide retirement benefits based on any portion of a monthly salary in excess of 500 dollars paid to any member of the Legislature unless the member receives the greater amount while serving as a member in the Legislature." (Art. IV, § 4.)[1] For those persons who would serve in the Legislature after the one-person-one-vote reapportionment and the conversion to a full-time Legislature, the constitutional revision provided: "The Legislature may, prior

---

[1]This restriction upon legislative pension levels has been upheld against constitutional attack. (*Lyons* v. *Flournoy, supra*, 217 Cal.App.2d at pp. 786-787; see also *Allen* v. *Board of Administration* (1983) 34 Cal.3d 114, 125 [192 Cal.Rptr. 762, 665 P.2d 534].)

to their retirement, limit the retirement benefits payable to members of the Legislature who serve during or after the term commencing in 1967." (Former art. IV, § 4.)[2]

In the November 1966 legislative elections plaintiff Walsh was elected to the state Senate. He took office in January 1967. He was reelected in 1970. In 1974 Walsh chose not to run for reelection. His second term of office expired on December 2, 1974, and he received full salary as a senator until January 5, 1975.[3]

Pursuant to our Constitution, 1971 was a decennial reapportionment year. In that year the Legislature enacted Government Code section 9359.04 to provide: "In lieu of retirement pursuant to Section 9359.01, a Member of the Senate or Assembly who is not returned to office, or who chooses not to run, or who resigns his office upon election or appointment to another public office during, or at any time after, the term in which the boundaries of the Senate or Assembly district which he represents, respectively, are altered pursuant to a reapportionment of legislative districts, may be retired upon his written application to the board, provided the member is credited with a minimum of four years service and was first elected to the Senate or Assembly prior to December 31, 1969. [¶] If a member does not retire at the conclusion of the term of office during which the boundaries of his district were altered pursuant to a reapportionment of legislative districts he shall notify the board in writing within 30 days after the conclusion of that term of his intention to retire pursuant to the provisions of this section at some unspecified future date. [¶] Service after the term in which a member's district was altered pursuant to a reapportionment of legislative districts shall be disregarded for purposes of computing any retirement allowance received as a result of qualifying for retirement pursuant to this section. However, such service shall be credited for purposes of computing the member's

---

[2]Under Government Code section 9360.9, retired members of the LRL received pension adjustments based upon the increase of the cost-of-living indices since 1954 regardless when the member retired. Thus, a member who retired in 1965 would receive a pension allowance based upon 1965 salary levels adjusted for the cost-of-living increase since 1954. (Stats. 1963, ch. 2174, § 2, p. 4563.) The 1966 constitutional revision provided that for members who served during the term which began in 1967 or thereafter, cost-of-living adjustments would be based upon the time of retirement, except that legislators could retain increases based upon the salary of $500 per month which had accrued before the 1967 term. (Former art. IV, § 4, as amended in 1966.)

[3]Before 1972 members of the Legislature commenced their terms in January of the year next following their election. In 1972 article IV, section 2, subdivision (a), was amended to provide that legislators begin their terms on the first Monday in December following their election. Article XX, section 6, provides that any legislator whose term is reduced by the 1972 amendment to article IV, section 2, shall be entitled to retirement benefits and compensation as though the term had not been reduced.

retirement allowance received after qualifying for retirement pursuant to provisions other than this section. [¶] A member who notifies the board of his intention to retire pursuant to the provisions of this section shall pay his contribution rate of 8 percent of gross salary to the Legislators' Retirement System during service after the term in which the boundaries of his district were altered pursuant to a reapportionment of legislative districts." (Stats. 1971, ch. 1820, § 2, pp. 3946-3947.)

The purpose of the enactment of Government Code section 9359.04 was expressly set forth: "It is the intent of the Legislature in enacting this act to provide for the retention in public service of experienced legislative leadership. [¶] Section 9359.01 of the Government Code was enacted during the 1965 reapportionment term. The Legislature recognizes that this section would be activated by the 1971 reapportionment. Therefore, the state is faced with the possibility of a mass retirement in the Legislature on January 1, 1973, and the consequent state retirement costs and the loss of experienced legislative leadership." (Stats. 1971, ch. 1820, § 3, p. 3947.)

In 1974 the Governor called the Legislature into extraordinary session to consider and act upon legislation relative to the LRL. In response the Legislature enacted urgency legislation to take immediate effect. (Stats. 1974, Second Ex. Sess., ch. 1, pp. 3953-3957.) The stated urgency was so the provisions of the act would be applicable to members who would leave office in 1974. (Stats. 1974, Second Ex. Sess, ch. 1, § 10, p. 3957.) The measure was signed by the Governor and became effective on October 7, 1974. Among other things, the act repealed sections 9359.01 and 9359.04 of the Government Code. (Stats. 1974, Second Ex. Sess., ch. 1, §§ 2, 4, p. 3953.) It was provided that the repeal of section 9359.01 should not be construed to affect the benefits of any member who retired pursuant to that section prior to January 3, 1967. (Stats. 1974, Second Ex. Sess., ch. 1, § 8, p. 3957.)

On September 30, 1974, Walsh wrote to the PERS Board to state: "It is my intention to retire at the close of my elected term of office. I hereby apply for retirement pursuant to the provisions of Government Code section 9359.01. [¶] I chose not to run for office for the term in which the boundaries of my Senate district were reapportioned." On October 15, 1974, the PERS Board replied to Walsh to advise him that section 9359.01 had been repealed effective October 7, 1974, and that he otherwise failed to meet the minimum age and service requirements for immediate retirement. At the end of his second term Walsh was 48 years old and was credited with 8 years of service.

On August 26, 1986, Walsh asked for an administrative appeal of the decision to deny his reapportionment retirement benefits. The PERS Board

stipulated that it had permitted him to keep his appeal rights open and thus accepted jurisdiction. After an administrative hearing the PERS Board denied Walsh's claim for additional pension benefits.[4] Walsh petitioned for a writ of administrative mandate. After a hearing the trial court issued a lengthy decision rejecting each of Walsh's contentions. Walsh appeals from the ensuing judgment which rejected his petition for a writ of mandate.

## DISCUSSION

### I

Walsh first contends the trial court erred in holding that the application of the repeal of Government Code sections 9359.01 and 9359.04 was authorized by the former version of article IV, section 4 and did not impair his vested rights to retirement benefits. We begin with the impairment of contract contention.

Article I, section 10, clause 1, of the Constitution of the United States sets forth certain powers that are prohibited to the states. Among other things, that section provides: "No state shall . . . pass any . . . law impairing the obligation of contracts, . . ." Under this clause, a "state can no more impair, by legislation, the obligation of its own contracts, than it can impair the obligation of the contracts of individuals." (*Woodruff* v. *Trapnall* (1850) 51 U.S. (10 How.) 190, 207 [13 L.Ed. 383, 390].)

When a claim is presented under the contract clause three questions may arise. First, it must be determined whether there is a valid contract to be impaired. The contract clause does not protect expectations that are based upon contracts that are invalid, illegal, unenforceable, or which arise without the giving of consideration. (*Crane* v. *Hahlo* (1922) 258 U.S. 142, 146 [66 L.Ed. 514, 517, 42 S.Ct. 214]; *Ochiltree* v. *Iowa R. R. Contracting Co.* (1875) 88 U.S. (21 Wall.) 249, 252-253 [22 L.Ed. 546, 548].) Nor does the contract clause protect expectations which are based upon legal theories other than contract, such as quasi-contract or estoppel. (*Freeland* v. *Williams* (1889) 131 U.S. 405, 414 [33 L.Ed. 193, 197, 9 S.Ct. 763]; *Louisiana* v. *Mayor, etc., New Orleans* (1883) 109 U.S. 285, 289-290 [27 L.Ed. 936, 938].), Second, if a contract is found, it must be determined whether

---

[4] Walsh's claim has been considered by the executive and legislative branches of government on several occasions, with consistent results. In 1974, the Legislative Counsel offered opinion No. 17955, advising that early reapportionment retirement could be denied to sitting members of the Legislature. In 1985, the Legislative Counsel offered opinion No. 10048, advising that the repeal of Government Code sections 9359.01 and 9359.04 was properly applied to deny early retirement benefits to a person who served during the period of Walsh's service. In 1987, upon a request of the PERS Board, the Attorney General published an opinion concluding that Walsh is not entitled to the benefits he seeks. (70 Ops.Cal.Atty.Gen. 214 (1987).)

a challenged law is consistent with its express or implied terms. ■ Modification of contractual rights through subsequent legislation may be consistent with, rather than an impairment of, the contract of the parties. (*City of Torrance* v. *Workers' Comp. Appeals Bd.* (1982) 32 Cal.3d 371, 379 [185 Cal.Rptr. 645, 650 P.2d 1162].) ■ Finally, if impairment is found, it must be determined whether the impairing law exceeds the bounds of the constitutional limitations. ■ Not every impairment of a contract will violate the contract clause. Thus, "the impairment provision does not prevent laws which restrict a party to the gains 'reasonably to be expected from the contract.' Constitutional decisions 'have never given a law which imposes unforeseen advantages or burdens on a contracting party constitutional immunity against change.' " (*Lyon* v. *Flournoy, supra*, 271 Cal.App.2d at p. 782, citation omitted.) And, "the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order." (*Home Building & Loan Asso.* v. *Blaisdell* (1934) 290 U.S. 398, 435 [78 L.Ed. 413, 427, 54 S.Ct. 231, 88 A.L.R. 1481].)

■ Whether a law violates the contract clause of the federal Constitution is a federal question, but determining the existence and meaning of a contract requires reference to state law. (*Indiana* ex rel. *Anderson* v. *Brand* (1938) 303 U.S. 95, 100 [82 L.Ed. 685, 690, 58 S.Ct. 443, 113 A.L.R. 1482].) In considering the existence and meaning of a contract the United States Supreme Court will grant deference to the highest state court to consider the matter unless that court's decision is "palpably erroneous" or "manifestly wrong." (*Hale* v. *Iowa State Board* (1937) 302 U.S. 95, 101 [82 L.Ed. 72, 76, 58 S.Ct. 102]; *Phelps* v. *Board of Education* (1937) 300 U.S. 319, 322-323 [81 L.Ed. 674, 677, 57 S.Ct. 483].) And where it is asserted that a statutory scheme creates contractual rights which may not be impaired by subsequent legislation, the United States Supreme Court will presume otherwise. ■ "The principal function of a legislative body is not to make contracts but to make laws which declare the policy of the state and are subject to repeal when a subsequent legislature shall determine to alter that policy." (*Indiana* ex rel. *Anderson* v. *Brand, supra*, 303 U.S. at p. 100 [82 L.Ed. at pp. 690-691].) Thus, it is presumed that a statutory scheme is not intended to create private contractual or vested rights and a person who asserts the creation of a contract with the state has the burden of overcoming that presumption. (*Dodge* v. *Board of Education* (1937) 302 U.S. 74, 79 [82 L.Ed. 57, 62, 58 S.Ct. 98].)

There is nothing inherent in government retirement plans which compels the conclusion that they are protected against modification under the federal Constitution. For example, federal laws which create pension plans are considered to be social and economic legislation and the pension plans are not contractual in nature and thus may be modified or even eliminated. (*U.S.*

*Railroad Retirement Bd.* v. *Fritz* (1980) 449 U.S. 166, 174 [66 L.Ed.2d 368, 375, 101 S.Ct. 453].) On some occasions the United States Supreme Court has upheld modification of state pension plans under the contract clause. (*Dodge* v. *Board of Education, supra*, 302 U.S. at pp. 78-81 [82 L.Ed. at pp. 61-63]; *Phelps* v. *Board of Education, supra*, 300 U.S. at p. 323 [81 L.Ed. at p. 677].) ■ However, under California law there is a strong preference for construing governmental pension laws as creating contractual rights for the payment of benefits. (See *Allen* v. *City of Long Beach* (1955) 45 Cal.2d 128 [287 P.2d 765]; *Terry* v. *City of Berkeley* (1953) 41 Cal.2d 698 [263 P.2d 833]; *Kern* v. *City of Long Beach* (1947) 29 Cal.2d 848 [179 P.2d 799].) Where it is feasible to do so the enactment of a governmental pension plan should be construed as guaranteeing full payment to those entitled to its benefits with the provision of adequate funds for that purpose. (*Bellus* v. *City of Eureka* (1968) 69 Cal.2d 336, 351 [71 Cal.Rptr. 135, 444 P.2d 711]. See also *Carman* v. *Alvord* (1982) 31 Cal.3d 318, 332 [182 Cal.Rptr. 506, 644 P.2d 192].)

■ The respondent PERS Board contends that the LRL, which is unique among California governmental pension plans, should not be construed to have granted contractual rights to its members. The LRL does appear unique among California governmental pension plans. In this state governmental pension plans are typically funded by (1) the creation of an actuarially based retirement fund; (2) a provision for continuous appropriations or continuing obligations of the governmental entity; or (3) some combination of both. (See, e.g., Gov. Code, §§ 20751, 20752 [state employees]; §§ 31963, 31964, 32030-32032 [county employees]; §§ 45342, 45343 [city employees]. See also 49 Cal.Jur.3d (1979) Pensions and Retirement Systems, § 11, pp. 224-225.) In enacting the LRL in 1947, the Legislature did not create an actuarially based fund and did not provide for continuous appropriations for the payment of benefits. Instead, funding for the payment of benefits under the LRL was left to future year-to-year appropriations. (Gov. Code, former § 9358, Stats. 1947, ch. 879, § 1, p. 2062.) In doing so the Legislature provided: "The provisions of Section 9358 do not constitute an appropriation of money from the State Treasury. The sum required for state contributions shall be appropriated in each State Budget Act, or otherwise." (Gov. Code, former § 9358.1, Stats. 1947, ch. 879, § 1, p. 2062.)[5]

Under our Constitution the state can incur valid contractual obligations in four ways: (1) by legislative authorization where the liability created will not

---

[5]In the mid-1970's the Legislature began to reform the LRL into an actuarially sound pension system. The legislative efforts in this regard included reducing benefits under the LRL to those consistent with a sound pension system, the creation of an actuarially based fund for the payment of future benefits, and, in 1977, the enactment of a continuing appropriation to support the payment of state contributions into the fund. (See Gov. Code, § 9354.5, Stats. 1972, ch. 1192, § 1, p. 2313 [requiring the PERS Board to maintain data and conduct an actuarial evaluation of the system]; Gov. Code, § 9359.1, Stats. 1974, Second Ex.

cause aggregate state liabilities to exceed $300,000; (2) by legislative authorization in case of war to repel invasion or suppress insurrection; (3) by compliance with constitutional debt limitation requirements, which include a two-thirds vote of each house of the Legislature and approval by the majority of the voters at a general election or direct primary; or (4) by legislative authorization supported by an appropriation. (Art. XVI, §§ 1, 7.) The LRL was not even arguably enacted in compliance with the first three of these means. ■ Where it is feasible to do so a retirement law will be construed as providing a continuing appropriation for the payment of benefits (*Carman* v. *Alvord, supra,* 31 Cal.3d at p. 332; *Bellus* v. *City of Eureka, supra,* 69 Cal.2d at p. 351), but that is not possible with the LRL in view of the Legislature's express declaration that the law was not an appropriation.

■ Under our Constitution the creation of an enforceable contract with the state requires compliance with the constitutional debt limitation provisions of article XVI, section 1, or a valid appropriation in support of the contract under article XVI, section 7. (*Riley* v. *Johnson* (1933) 219 Cal. 513, 520-521 [27 P.2d 760, 92 A.L.R. 1292]; *People* v. *Pacheco* (1865) 27 Cal. 175, 210-221.) In this respect our law is consistent with federal law and the law of nearly every state in the Union. (*Humbert* v. *Dunn* (1890) 84 Cal. 57, 59 [24 P. 111]. See *Sutton* v. *United States* (1921) 256 U.S. 575, 578-579 [65 L.Ed. 1099, 1101-1102, 41 S.Ct. 563, 19 A.L.R. 403].) Persons who deal with the government are held to have notice of this limitation upon the authority to enter into contracts. (*Ibid.*)

■ The PERS Board asserts that since the LRL was not supported by a continuing appropriation during the period of Walsh's service, it follows that he could not have acquired a contractual right to the payment of specific benefits. In this assertion the PERS Board relies upon a recent decision of this court in the consolidated cases of *Knight* v. *Board of Administration of the Public Employees' Retirement System** (Cal.App.) C005934 and *Flournoy* v. *Board of Administration of the Public Employees Retirement System** (Cal.App.) C005622. In that decision we relied in part on such reasoning in rejecting contract clause attacks upon article III, section 7, which was added to the Constitution by Proposition 57 at the November 1986 General Elec-

---

Sess., ch. 1, § 5, p. 3953 [restricting the theretofore extraordinary cost-of-living raises granted under the LRL]; Gov. Code, § 9358, Stats. 1977, ch. 937, § 2, p. 2864 [providing a continuing appropriation for state contributions to the fund].) The enactment of an appropriation in support of the LRL occurred well after Walsh's service ended and cannot apply to him. (See *Longshore* v. *County of Ventura* (1979) 25 Cal.3d 14, 23, 27 [157 Cal.Rptr. 706, 598 P.2d 866]; *Simpson* v. *Cranston* (1961) 56 Cal.2d 63, 69-70 [13 Cal.Rptr. 668, 362 P.2d 492]; *Martin* v. *Henderson* (1953) 40 Cal.2d 583, 591 [255 P.2d 416].)

*Reporter's Note: Opinion (C005934, C005622) deleted upon direction of Supreme Court by order dated December 20, 1990.

tion, and which restricted certain pension benefit increases to former executive officers. The California Supreme Court denied a petition for review, the United States Supreme Court denied a petition for a writ of certiorari, and that decision is now final. However, the California Supreme Court directed that the decision not be published in the official reports and thus it lacks precedential value. (Cal. Rules of Court, rule 977(a).)

In view of the depublication of our opinion in the *Knight* and *Flournoy* cases, we will consider the PERS Board's assertion to be a request that we consider and reiterate the reasoning we employed there. In this case, however, it is unnecessary to do so. Throughout the period of Walsh's service our Constitution contained an express reservation of power to the Legislature to limit the retirement benefits of members of the Legislature before their retirement. (Art. IV, § 4, par. 3, as amended Nov. 8, 1966.) The modification of a retirement plan pursuant to a reservation of the power to do so is consistent with the terms of any contract extended by the plan and does not violate the contract clause of the federal Constitution. (*International Assn. of Firefighters* v. *City of San Diego* (1983) 34 Cal.3d 292, 300-303 [193 Cal.Rptr. 871, 667 P.2d 675]; *City of Torrance* v. *Workers' Comp. Appeals Bd.*, *supra*, 32 Cal.3d at p. 379; *Wallace* v. *City of Fresno* (1954) 42 Cal.2d 180, 183 [265 P.2d 884].) If the modification of Walsh's retirement benefits was consistent with the reservation of power to the Legislature, then it was valid regardless whether the LRL can be said to have granted contractual rights to members of the Legislature. Accordingly, we turn to that question.[6]

## II

 Former article IV, section 4, paragraph 3, provided in relevant part: "The Legislature may, prior to their retirement, limit the retirement benefits payable to members of the Legislature who serve during or after the term commencing in 1967." Walsh asserts that whatever power this gave the

---

[6]In *Legislature* v. *Eu* (1991) 54 Cal.3d 492 [286 Cal.Rptr 283, 816 P.2d 1309], the California Supreme Court considered the constitutional validity of Proposition 140 adopted at the November 6, 1990, General Election, a proposition which has been referred to as the term limitation initiative. Although the court generally upheld the provisions of the measure, it struck down provisions which would have terminated the LRL with respect to incumbent members of the Legislature. (*Id.* at pp. 528-534.) The high court concluded that while the question is not free from doubt, federal decisional authorities would not appear to withhold contract clause protection from incumbent state legislators who have acquired vested pension rights under state law. (*Id.* at p. 533.) As we have previously noted, in 1977 the Legislature enacted a continuing appropriation in support of the LRL. (Gov. Code, § 9358; Stats. 1977, ch. 937, § 2, p. 2864.) We have no doubt that incumbent members of the Legislature at the time of the adoption of Proposition 140 had contractually vested pension rights under the LRL which would be protected under the contract clause. The question whether a former member

Legislature, it did not permit it to abrogate or eliminate his retirement benefits.

First, we reject the assertion that Walsh's retirement benefits were abrogated or eliminated. Over the years the LRL has been amended many times, usually to increase benefits or to provide new types of benefits. Through the years the basic requirements for eligibility to draw benefits have been based upon age and length of service. The LRL now provides that a member may retire at the age of 60 with 4 years of service, after 20 years of service regardless of age, or after 15 years of service regardless of age but with a reduction in benefits equal to 2 percent for every year the member is less than 60 years of age. (Gov. Code, §§ 9359, 9359.16.)[7]

After Walsh's second term in the state Senate, he was credited with eight years of service. His eligibility to retire at age 60 under the basic LRL eligibility provisions was not affected by the 1974 urgency legislation and in fact he did begin to draw LRL benefits at age 60. Under these circumstances Walsh's retirement benefits were not "abrogated" or "eliminated," which would imply a complete denial of benefits. Thus, the question is not whether his benefits were eliminated but is rather whether the denial of early, reapportionment-based retirement was within the power of the Legislature to limit Walsh's retirement benefits.

In interpreting a statute or constitutional provision the first reference must be to the words used in the provision. Such words should be given the meaning they bear in ordinary usage and if the language of the provision is clear and unambiguous then there is no need for judicial construction. (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755

of the Legislature acquired a contractual right to wholly unmodifiable pension benefits when he served during a time when the LRL was neither actuarially funded nor supported by a continuing appropriation, was not a question which was implicated in the *Legislature* v. *Eu* decision.

[7]When it was enacted in 1947 the LRL provided for retirement at age 63 with 1 or more years of service. (Stats. 1947, ch. 879, § 1, p. 2062.) In 1949 it was amended to add a provision to permit a member to retire after 20 years of service regardless of age. (Stats. 1949, ch. 1570, § 6, p. 2809.) In 1951 it was amended to provide that any member serving on the effective date of the amendment could retire at age 63 regardless of the length of service, those later elected could retire at age 63 with 6 years of service, and any member could retire after 20 years of service regardless of age. (Stats. 1951, ch. 1660, § 4, p. 3793.) In 1961 the LRL was amended to provide that members serving upon the effective date of the amendment could retire at age 60 regardless of the length of service, later elected members could retire at age 60 with 4 years of service, and any member could retire after 20 years of service regardless of age. (Stats. 1961, ch. 1897, § 1, pp. 4005-4006.) Also in that year Government Code section 9359.16 was enacted to permit a member to retire before age 60 with a reduced allowance after 15 years of service. (Stats. 1961, ch. 1897, § 3, p. 4007.) These are the basic requirements which obtain now.

P.2d 299].) ▨ "Limit" generally means "To abridge, confine, restrain, and restrict. To mark out; to define; to fix the extent of. . . ." (Black's Law Dict. (5th ed. 1979) p. 834.) Webster's Third New International Dictionary (1971) at page 1312, provides the following definitions of limit: "to assign to, or within certain limits." "To set bounds or limits to." And, "to curtail or reduce in quantity or extent." Synonyms include restrict, circumscribe and confine. (*Ibid.*) It is said that "LIMIT stresses the fact of the existence of boundaries, . . ." (*Ibid.*) ▨ In the 1974 urgency legislation the Legislature did not eliminate Walsh's retirement benefits; rather, it confined his benefits to those consistent with the basic eligibility provisions of the LRL by repealing provisions which would have made him eligible for extraordinary benefits. This action would, on its face, appear to be consistent with the Legislature's reserved power to limit retirement benefits under the LRL.

The LRL, as it was enacted and during the period of Walsh's service, was unique in more ways than one. For one thing, the benefit and eligibility criteria of the LRL were under the direct control of the very persons who expected to receive benefits under it. For another thing, the LRL and its numerous amendments were enacted without any attempt to create an actuarially based fund or to provide continuing appropriations for its benefits, and thus the LRL was not subjected to comprehensive planning with respect to the benefits which would become payable and the source of funds to pay them. As a result the LRL was peculiarly susceptible to the possibility of conferring unwarranted windfall benefits to its members and of creating an unreasonable drain on the public fisc. (See *Lyon* v. *Flournoy, supra,* 271 Cal.App.2d at p. 786.)

In its decision in this case the trial court concluded that the reservation of power in the Legislature to limit retirement benefits under the LRL was enacted "not only to prevent a windfall to retired and retiring legislators, but also to provide the Legislature with a general authority to restrict retirement benefits in the future when necessary to control excesses in the system." That this is undoubtedly correct is established by reference to the terms of former article IV, section 4. It further appears that the early retirement sought by Walsh is precisely the type of excess which the Legislature had the power to correct.

The 1965 provision for early, reapportionment-based retirement was an extraordinary measure enacted in extraordinary circumstances. At the time the Legislature was not only contemplating transformation into a full-time body with significantly increased compensation, it was also facing the first election under court-ordered reapportionment made necessary by equal protection principles. In short, the Legislature was facing the end of one era and

the beginning of another. These changes were likely to have a profound effect on at least some of the incumbents. It was under those circumstances that the Legislature determined to permit early reapportionment-based retirement for its members. But whatever the wisdom of such "golden parachute" legislation during the turmoil of the '60's, the measure did not serve, and was contrary to, the purposes of a public pension plan in later decennial reapportionment years.

 The purpose of a public pension system is to permit employees who become superannuated or otherwise incapacitated to retire without hardship and to be replaced by more capable employees. (See Gov. Code, § 20001; *Quintana* v. *Board of Administration* (1976) 54 Cal.App.3d 1018, 1021 [127 Cal.Rptr. 11].) Superannuated, of course, means "incapacitated or disqualified for active duty by advanced age." (Webster's Third New Intern. Dict., *supra*, p. 2293.) That this was the purpose of the LRL is beyond dispute. In *Knight* v. *Bd. etc. Employees' Retirement, supra,* 32 Cal.2d at pages 402 and 403, the Supreme Court held that the Legislature had the power to enact the LRL under former article IV, section 22a, which provided in full: "The Legislature shall have power to provide for the payment of retirement salaries to employees of the State who shall qualify therefor by service in the work of the State as provided by law. The Legislature shall have power to fix and from time to time change the requirements and conditions for retirement which shall include a minimum period of service, a minimum attained age and minimum contribution of funds by such employees and such other conditions as the Legislature may prescribe, subject to the power of the Legislature to prescribe lesser requirements for retirement because of disability. [¶] The rates of contribution and the periods and conditions of service and amount of retirement salaries fixed in pursuance of this section shall not be changed except by the vote of two-thirds of the members elected to each of the two Houses of the Legislature."[8] The reapportionment-based retirement benefits sought by Walsh would have entitled him to immediate retirement with minimal service and without regard to age or disability. Such an extraordinary result is not permitted under other types of public pension plans and is inconsistent with the purpose of a governmental retirement plan.

 In addition to providing subsistence for the old age or disability of individual employees and their dependents, public pension plans serve the public purpose of inducing qualified persons to enter and continue in public

---

[8]Since article IV, section 22a, provided the authority to the Legislature to enact the LRL, and since that section required state pension plans to include minimum age requirements except in cases of disability, the reapportionment-based retirement provisions of Government Code section 9359.01, enacted in 1965, were in facial conflict with the Constitution.

service. (*Phillipson* v. *Board of Administration* (1970) 3 Cal.3d 32, 49 [89 Cal.Rptr. 61, 473 P.2d 765]; *Quintana* v. *Board of Administration, supra,* 54 Cal.App.3d at p. 1021.) Soon after the conversion to a full-time Legislature, the Legislature learned that early reapportionment-based retirement was contrary to this purpose. It specifically so declared in the Statutes of 1971, chapter 1820, section 3, at page 3947. This factor, and the added burden upon the public treasury in paying early retirement benefits, caused the Legislature first to modify, and finally to repeal eligibility for early retirement based upon reapportionment.

Under these circumstances it appears that the windfall benefits granted under former Government Code sections 9359.01 and 9359.04 were precisely the type of excess that the Legislature was given the power to correct in the constitutional revision of 1966. We do not find the repeal of those sections prior to Walsh's retirement to have been beyond the power of the Legislature under former article IV, section 4.

The recent decision in *Legislature* v. *Eu, supra,* 54 Cal.3d 492, does not alter this conclusion. There, the Supreme Court generally upheld reformation of the Legislature by the initiative process, but struck down provisions which would terminate the LRL with respect to incumbent members of the Legislature. In referring to present article IV, section 4, subdivision (c), the court emphasized that the provision permitted *the Legislature* to limit retirement benefits of its members under the LRL and concluded that "the provision neither states nor implies that these rights are thus deemed inchoate and unprotected from impairment by the initiative process." (54 Cal.3d at p. 529.) The court also noted that Proposition 140 contemplated the complete termination of the LRL rather than the mere modification or adjustment of pension rights of incumbent legislators and then ruled that the measure could not be upheld under the potential but unexercised limitations of article IV, section 4. (54 Cal.3d at p. 530.) Here we are concerned with a legislative limitation upon pension benefits rather than the termination of pension rights by initiative measure, and the decision in *Legislature* v. *Eu* is consequently inapposite.

### III

 Walsh contends that even if he could not retire at the end of his term under former Government Code section 9359.01, he was entitled to retire under former Government Code section 9359.04, which was also repealed in 1974, and that the PERS Board should have so advised him. We have set forth the text of Government Code section 9359.04 earlier in this opinion. We agree with the PERS Board and the trial court that Walsh was not entitled to retire under this provision.

Walsh relies upon certain language from section 9359.04. Thus he asserts (with italics his) that the section provides: "In lieu of retirement pursuant to § 9359.01, a member of the Senate . . . who chooses not to run . . . *during . . . term in which the boundaries of the Senate or Assembly district which he represents, respectively, are altered pursuant to reapportionment of legislative districts, may be retired upon his written application to the board, . . . .*' " According to Walsh, the phrase "upon his written application" signifies immediacy and should be construed to mean contemporaneously with his application. Therefore, the argument continues, a member of the Legislature would be entitled to immediate retirement in midterm simply by submitting an application for retirement to the PERS Board. Since Walsh submitted his application for retirement under Government Code section 9359.01 shortly before, and in anticipation of, the effective date of the repeal of Government Code sections 9359.01 and 9359.04, he asserts that he was entitled to immediate retirement under Government Code section 9359.04 and should have been so advised by the PERS Board.

 In a statute which provides for one event "upon" some other contingency, the word "upon" is a word of variable meaning. It may mean "at the time of" or "with little or no interval thereafter." On the other hand, it may mean "in consequence of" or "on condition of," without implying contemporaneity. (See 70 Ops.Cal.Atty.Gen. 214, 216 (1987) and authorities cited there; see also *Youngstown Steel* v. *State Bd. of Equal.* (1957) 148 Cal.App.2d 205, 208-210 [306 P.2d 983].) In this case we are satisfied that Government Code section 9359.04 used the phrase "upon his written application" as a condition to, rather than the time of, retirement.

Under the LRL "retirement" commences when the member begins to draw a retirement allowance. (Gov. Code, § 9351.1.) And no retirement allowance or optional settlement in lieu thereof may be paid to or in respect of any person during any time in which he or she holds office as a legislator. (Gov. Code, § 9359.15.) Thus, in order for a member of the Legislature to be entitled to retirement in midterm, he or she would have to resign from office. Resignation from the Legislature is a formal matter. It requires that the member submit a written resignation to the presiding officer of his or her house for immediate transmission to the Governor. (Gov. Code, § 1750, subd. (c).) The PERS Board obviously has no authority to accept a resignation of a member of the Legislature. In Government Code section 9359.04 the Legislature did not provide for the retirement of a person who chose not to run upon his written application *and resignation* from the Legislature, as would be required for retirement before the end of a member's term. In fact, the only reference to resignation in Government Code section 9359.04 is to members who left the Legislature to accept another public office. This is a

strong indication that the Legislature did not intend to provide for retirement before the end of the term for which the member was elected when the member chose not to run for reelection.

Walsh also relies upon the word "during" in Government Code section 9359.04, as it was used with respect to a reapportionment term. That section provided for retirement of three classes of persons, separated by punctuation marks. These were members of the Legislature whose districts were reapportioned and who (1) were not returned to office, (2) chose not to run, or (3) resigned upon election or appointment to another office. The qualifying word "during" was attached without separation through punctuation to the class of legislators who resigned upon election or appointment to another office. ▉▉▉ "Generally, a qualifying phrase applies to the word, phrase or clause immediately preceding it, unless context or evident meaning require a different construction." (*People* v. *Cruz* (1974) 12 Cal.3d 562, 566 [116 Cal.Rptr. 242, 526 P.2d 250].) ▉▉▉ Under this rule the word "during" would appear to apply only to those members of the Legislature who resigned to accept another office and not to those who were not returned to office or chose not to run for reelection.

Any doubt in the matter is dispelled by reference to the Legislature's expressed intent in enacting Government Code section 9359.04. In section 3, of chapter 1820, of the Statutes of 1971, the Legislature recognized that allowing reapportionment-based retirement encouraged premature retirement and stated that the purpose of Government Code section 9359.04 was to provide for the retention in public service of experienced legislators. This purpose was to be accomplished by permitting members to defer reapportionment-based retirement while remaining in the Legislature. The measure was not intended to encourage resignation of sitting members of the Legislature in order to obtain its benefits. For all of these reasons we agree with the PERS Board and the trial court that Walsh was not entitled to retire under Government Code section 9359.04 before its repeal.

IV

▉▉▉ Walsh contends that he was entitled to retire at the end of his term under Government Code section 9360.11, which was enacted in the 1974 urgency legislation. (Stats. 1974, Second Ex. Sess., ch. 1, § 8, p. 3957.) Section 9360.11 provides: "Notwithstanding any other provisions of this chapter, any member who would have been eligible to retire under Section 9359.01 had it not been repealed because he did not return to office or who would have been eligible to retire under such section had it not been repealed and had he chosen not to run or not been returned to office

following the reapportionment of his district shall be deemed eligible for retirement for purposes of Sections 9360.7 and 9361.1 at any time thereafter."

Government Code section 9361.1 is part of article 7 of the LRL, which provides for optional settlements. Under that article a member of the LRL could elect to receive lesser benefits for life in return for a continuation of benefits to his or her beneficiary or estate upon his or her death. (Gov. Code, § 9361.) Under Government Code section 9361.1, any election, revocation, or change in election had to be made before the first payment on account of any retirement allowance. The fifth paragraph of Government Code section 9361.1 provides, in relevant part: "If a member who is eligible for retirement has elected one of the optional settlements specified in this article, the surviving spouse of such member shall receive the same benefits as such surviving spouse would have received if the date of his death had also been the date of his retirement and if retirement had preceded death. . . . If a member dies without having elected an optional settlement and there is a surviving spouse, he shall be deemed for the purpose of this paragraph to have elected Optional Settlement No. 2. . . ."

Government Code section 9360.7, was enacted subsequent to the provisions for optional settlements and was amended in the 1974 urgency legislation. (Stats. 1974, Second Ex. Sess., ch. 1, § 6, pp. 3955-3956.) Under that section a member of the Legislature who retires for service or disability receives a retirement allowance unmodified by any optional settlement which may have been elected. In the event a member dies after retirement then his or her surviving spouse may elect to receive an allowance equal to one-half of the member's allowance, in which case any optional settlement would not be payable. The third paragraph of section 9360.7 provides, in relevant part: "The surviving spouse of a member who is a Member of the Senate or Assembly and who dies before retirement but after becoming eligible for retirement may elect to receive an allowance under this section. . . ."

Neither section 9360.7 nor section 9361.1 of the Government Code provides criteria for the retirement of a member of the LRL. Rather, both sections provide for certain benefits which may be payable to the survivors of a retired member upon his or her death. In each statute the phrase "eligible for retirement" is used with respect to a member who has satisfied the relevant retirement criteria but who has not yet retired. That phrase is employed in each statute to provide survivor benefits to the survivors of a member who had satisfied retirement criteria but had not yet retired. Under these circumstances deeming a member "eligible for retirement" for purposes of Government Code sections 9360.7 and 9361.1 could have no

meaning with respect to the retirement of the member, since those sections do not provide retirement criteria for the member. Rather, the provisions of Government Code section 9360.11 were obviously intended to preserve survivor and optional settlement benefits for a member who would have been but is not eligible to retire due to the repeal of Government Code section 9359.01.

Walsh asserts that the enactment of Government Code section 9360.11 in the same bill that repealed Government Code sections 9359.01 and 9359.04 was actually a "skillful manipulation of the legislative process" and that neither the press nor the Legislative Counsel realized what had been done.[9] According to this argument, the Legislature repealed early reapportionment-based retirement in appearance only in order to mollify "an antagonistic press and the sour discord of constituents." It then craftily snuck those benefits back into the law by enacting Government Code section 9360.11. We would be loath to ascribe such an unconscionable and Machiavellian purpose to our Legislature and will not do so in the absence of clear language dictating such a result. Since a reasonable reading of Government Code section 9360.11 in conjunction with Government Code sections 9360.7 and 9361.1 does not support, let alone compel, such a bizarre interpretation we will not adopt it.

V

Walsh claims that the state is estopped to deny reapportionment-based retirement benefits to him. He argues that when he was elected to the Legislature and joined the LRL he was informed that reapportionment-based retirement would be available under Government Code section 9359.01. In 1970 his wife of 20 years filed a petition for dissolution of marriage and a final judgment incorporating a property settlement agreement was entered in March 1971. Walsh asserts that during negotiations over the property settlement he was aware that his district might be reapportioned. He further asserts that in the dissolution he gave up his interest in his wife's Shaklee Products business and secured his pension benefits. He thus argues that the state must be estopped from denying reapportionment-based retirement benefits for this reason. The argument is specious.

Estoppel poses a factual question which must be pled and proven in the trial court. (*Aetna Casualty & Surety Co.* v. *Humboldt Loaders, Inc.*

---

[9]Throughout the legislative process the Legislative Counsel consistently advised that Government Code section 9360.11 preserved only the surviving spouse, dependent children, and optional settlement benefits of a member who would have been but is not eligible to retire due to the repeal of Government Code section 9359.01. Walsh asserts that the Legislative Counsel was simply wrong, and that the manipulation of the process was so skillful that even the Legislative Counsel was fooled.

(1988) 202 Cal.App.3d 921, 930 [249 Cal.Rptr. 175]; *Green v. Travelers Indemnity Co.* (1986) 185 Cal.App.3d 544, 555 [230 Cal.Rptr. 13].) The trial court found against Walsh on this issue and thus on appeal he has the burden not only to point to evidence which might support his claim, but to show that the evidence compelled a finding in his favor. (*Rubin v. Los Angeles Fed. Sav. & Loan Assn.* (1984) 159 Cal.App.3d 292, 298 [205 Cal.Rptr. 455]; *McKinney v. Kull* (1981) 118 Cal.App.3d 951, 955 [173 Cal.Rptr. 696].) In his appellate brief Walsh makes certain factual assertions but provides no references to the record to support these assertions and makes no effort to show that there is no evidence in the record which would support the conclusion of the trial court. This alone is sufficient reason to reject his claim of estoppel.

In any event, we have read the record and find that it not only does not compel a finding of estoppel, it would not support such a finding. A person who asserts an estoppel must prove (1) a representation or concealment of material facts (2) made with knowledge, actual or virtual, of the true facts (3) to a party ignorant, actually and permissibly, of the truth (4) with the intention, actual or virtual, that the latter act upon it and (5) that the party actually was induced to act upon it. (11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 177, p. 859.) Walsh's showing was glaringly deficient in at least two respects.

First, Walsh failed to show detrimental reliance upon a representation of the state. At the PERS Board hearing, Walsh stated that at the time of his dissolution he was aware of the provisions of Government Code section 9359.01 and that his district might be reapportioned during his next term. He stated that the PERS Board did not advise him that his benefits could be limited under the provisions of former article IV, section 4, and that he was otherwise ignorant of that constitutional provision. He also stated that the matter of his retirement was discussed between the parties and attorneys during the dissolution. He did not testify that he relied to his detriment upon the possibility of early retirement in accepting the property settlement agreement, nor did he introduce evidence that would support that claim.

Walsh did introduce into evidence his property settlement agreement. In that agreement his wife received a 1966 GTO automobile, a 1965 Volkswagen bus, a portion of the household furniture and furnishings to be agreed upon, total interest in her Shaklee Products distributorship, all moneys in financial institutions in her name or the name of the distributorship, her personal effects, a promissory note for $3,000, and a life insurance policy with a face value of $1,000 subject to a lien of $125. Walsh received the family residence, a portion of the furniture and furnishings to be agreed

upon, all interests in two corporations—the Walsh Equipment Company and the Walsh Equipment Rental Company, his legislative retirement, all moneys in financial institutions in his name or in the Walsh company names, all furnishings and fixtures in his Sacramento apartment and in his offices in Sacramento and Commerce, California, his personal effects, and an insurance policy with a face value of $2,318 subject to a lien of $262. Walsh agreed to hold his wife harmless with respect to two promissory notes of the Walsh corporations which had been guaranteed by the parties. His wife agreed to hold him harmless from all debts of the Shaklee business. Finally, after 20 years of marriage wife waived forever any right to seek spousal support. Walsh would have us infer from this agreement that he waived an interest in the Shaklee business in return for his pension rights with an expectation of early retirement. However, such a claim is certainly not apparent from the face of the settlement agreement and on this record is, at best, pure speculation.

Secondly, in order for reliance upon a representation to support an estoppel, the reliance must be justified, that is, the party asserting the estoppel must show that he was actually and permissibly ignorant of the true facts. Walsh professes ignorance that his benefits could be limited under former article IV, section 4. However, we are not here considering an obscure provision in a complicated statutory scheme. Rather, we are considering a provision in the basic organic law of this state; it is a part of the fundamental law which created and defined the rights and responsibilities of the office which Walsh held. We cannot conclude that Walsh could be permissibly ignorant of the fundamental constitutional provisions applicable to his office. Accordingly, we find no support for Walsh's claim of estoppel.

## VI

■ Walsh finally contends that retirement benefits are compensation and that any adjustment in compensation cannot have application until the commencement of the regular session following the next general election after enactment of the adjustment. Former article IV, section 4, contained four paragraphs.[10] The first paragraph provided: "Compensation of members of the Legislature, and reimbursement for travel and living expenses in

---

[10]Article IV, section 4 was extensively revised by the passage of Proposition 112 at the June 5, 1990, election. As amended by that initiative, subdivision (c) of that section now reads: "The Legislature may not provide retirement benefits based on any portion of a monthly salary in excess of five hundred dollars ($500) paid to any Member of the Legislature unless the Member receives the greater amount while serving as a Member in the Legislature. The Legislature may, prior to their retirement, limit the retirement benefits payable to Members of the Legislature who serve during or after the term commencing in 1967. [¶] When computing the retirement allowance of a Member who serves in the Legislature during the term

connection with their official duties, shall be prescribed by statute passed by roll-call vote entered in the journal, two thirds of the membership of each house concurring. Commencing with 1967, in any statute enacted making an adjustment of the annual compensation of a member of the Legislature the adjustment may not exceed an amount equal to 5 percent for each calendar year following the operative date of the last adjustment, of the salary in effect when the statute is enacted. Any adjustment in the compensation may not apply until the commencement of the regular session commencing after the next general election following enactment of the statute."[11] (As enacted Nov. 8, 1966.) The second and third paragraphs dealt with retirement benefits and the reservation of the power to limit benefits before retirement of members serving during or after the term which commenced in 1967 is in the third paragraph.

We must reject Walsh's contention for several reasons. First, it is too late in the day to assert that retirement benefits are controlled by the "compensation" provisions of former article IV. When the LRL was enacted in 1947, former article IV contained provisions (1) providing that members of the Legislature were permitted to receive no compensation other than that fixed by the Constitution and (2) prohibiting the Legislature from granting any extra compensation or allowance to any public officer, agent, servant, or contractor, after service had been rendered or after a contract had been entered into and performed in whole or in part. (Former art. IV, §§ 23b. 32.) Nevertheless, under the constitutional provision which permitted the Legislature to provide for retirement benefits for employees of the state, the Legislature was permitted, with Supreme Court approval, to establish the LRL and to give it immediate effect for the benefit of sitting members. (*Knight* v. *Bd. etc. Employees' Retirement, supra,* 32 Cal.2d at pp. 402-403.) In subsequent years the Legislature amended the LRL to provide new and increased benefits literally dozens of times. The amendments were made immediately available to sitting members and in many cases were extended to members who had already completed their service. (See the amendments to the LRL set forth *supra,* on pp. 691-692; see also Gov. Code, § 9360.9, renumbered and amended by Stats. 1963, ch. 2174, § 2, p. 4563; *Lyon* v. *Flournoy, supra,* 271 Cal.App.2d at p. 785.) These legislative actions would

commencing in 1967 or later, allowance may be made for increases in cost of living if so provided by statute, but only with respect to increases in the cost of living occurring after retirement of the Member. However, the Legislature may provide that no Member shall be deprived of a cost of living adjustment based on a monthly salary of five hundred dollars ($500) which has accrued prior to the commencement of the 1967 Regular Session of the Legislature."

[11]When it was enacted in 1966, former article IV, section 4, contained another paragraph dealing with mileage expenses for travel to attend reconvening following a 30-day recess after a regular session. This paragraph was deleted by a 1972 amendment.

not have been permissible, and might have to be reconsidered, if we were to now declare that the LRL is subject to the "compensation" restraints of the Constitution.

In the 1966 constitutional revision the provision prohibiting the Legislature from granting extra compensation was retained in article IV, section 17. The first paragraph of former article IV, section 4, dealt with annual compensation of the Legislature. In that section the Legislature was given the authority to adjust its own compensation, subject to a 5-percent-per-year limitation. In that paragraph "compensation," "annual compensation," and "salary" are used interchangeably. It is there that the provision for delayed effectiveness of any adjustment in the compensation of the Legislature is found. Since 1966 the Constitution has dealt with legislative retirement in specific provisions separate from the provision for annual compensation. We have previously noted that a qualifying phrase is generally construed to apply to the word, phrase or clause immediately preceding it and not to more remote matters. (*People* v. *Cruz, supra,* 12 Cal.3d at p. 566.) Additional rules of construction require that we give effect to specific provisions over general provisions (*Bilyeu* v. *State Employees' Retirement System* (1962) 58 Cal.2d 618, 626 [25 Cal.Rptr. 562, 375 P.2d 442]; *Robertson* v. *Willis* (1978) 77 Cal.App.3d 358, 365 [143 Cal.Rptr. 523]), and that we adopt an interpretation which will effectuate rather than negate the purpose expressed in a measure (*Cal Pacific Collections, Inc.* v. *Powers* (1969) 70 Cal.2d 135, 140 [74 Cal.Rptr. 289, 449 P.2d 225]; *In re Marriage of Havens* (1981) 125 Cal.App.3d 1012, 1016 [178 Cal.Rptr. 477]). In order to adopt Walsh's contention we would be required to reject long-standing and settled views with respect to governmental retirement systems, exalt remote general constitutional provisions over specific provisions, and eviscerate the Legislature's retained power to limit retirement allowances before retirement of legislators. We decline to adopt such a convoluted construction of the Constitution.

DISPOSITION

The judgment is affirmed.

Sims, J., and Raye, J., concurred.

A petition for a rehearing was denied April 6, 1992, and appellant's petition for review by the Supreme Court was denied June 11, 1992. Mosk, J., was of the opinion that the petition should be granted.